**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| DARRICK ENTERPRISES, | : | Civil Action No. 05-4359(NLH) |
| d/b/a VINELAND MITSUBISHI, | : | |
| GREGORY A. MORRETT, | : | |
| RICHARD J. HESS, and | : | |
| DARLENE J. HESS, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| MITSUBISHI MOTORS CORPORATION, | : | |
| MITSUBISHI MOTORS | : | |
| NORTH AMERICA, INC., and | : | |
| MITSUBISHI MOTORS CREDIT | : | |
| OF AMERICA, INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**APPEARANCES:**

James H Steigerwald, Esquire
Wayne A. Mack, Esquire
J. Manly Parks, Esquire
Michael S. Zullo, Esquire
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103-4196
     *Attorneys for Plaintiffs*

Regina Cohen, Esquire
Lavin, O'Neil, Ricci, Cedrone & Disipio
1300 Route 73
Suite 307
Mount Laurel, NJ 08054

John R. Skelton, Esquire (admitted *pro hac vice*)
Brandon L. Bigelow, Esquire (admitted *pro hac vice*)
Serena D. Madar, Esquire (admitted *pro hac vice*)
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
     *Attorneys for Defendants Mitsubishi Motors Corporation and*
     *Mitsubishi Motors North America, Inc.*

Kathleen Cavanaugh, Esquire
Greiner, Gallagher & Cavanaugh, LLC
2001 Route 46

Suite 202
Parsippany, NJ 07054
        *Attorney for Mitsubishi Motors Credit of America, Inc.*

I.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . 3

II.   ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . 5

A.    MITSUBISHI MOTORS OF NORTH AMERICA'S MOTION TO DISMISS . . 5
      1.    *Whether Vineland has adequately pleaded common law*
            *fraud claims and RICO* . . . . . . . . . . . . . . 7
            a.  Common law fraud . . . . . . . . . . . . . . . 7
            b. RICO . . . . . . . . . . . . . . . . . . . . . 10
                  1.   Whether Plaintiffs have adequately
                       established an existence of an
                       enterprise . . . . . . . . . . . . . . 16
                  2.   Whether Plaintiffs have adequately
                       established the appropriate predicate acts
                       and a pattern of racketeering activity by
                       MMNA . . . . . . . . . . . . . . . . . 18
                       a.   Predicate acts . . . . . . . . . . 18
                       b.   Pattern of racketeering activity . . 20
      2.    *Whether the General Release Bars Plaintiffs' Claims* 22
      3.    *Individual Plaintiffs' Claims* . . . . . . . . . . 24
            a.   The individual plaintiffs' fraud claims . . . 25
            b.   The individual plaintiffs' RICO claims . . . . 32
            c.   The individual plaintiffs' statutory claims . 32
                  1.   Franchise Practices Act . . . . . . . . 33
                  2.   Automobile Dealers' Day in Court Act . . 36
                  3.   Consumer Fraud Act claims . . . . . . . 43
      4.    *The Corporation's Claims* . . . . . . . . . . . . 44
            a.   ADDCA . . . . . . . . . . . . . . . . . . . . 45
            b.   FPA and Breach of Contract Claim . . . . . . 47
      5.    *Warranty Reimbursement* . . . . . . . . . . . . . 51

B.    MMCA'S MOTION TO DISMISS . . . . . . . . . . . . . . . 54
      1.    *RICO claims* . . . . . . . . . . . . . . . . . . . 56
      2.    *ADDCA claims* . . . . . . . . . . . . . . . . . . 59
      3.    *Breach of implied covenant of good faith and fair*
            *dealing claim* . . . . . . . . . . . . . . . . . . 62

C.    MMC-JAPAN'S MOTION TO DISMISS . . . . . . . . . . . . . 64
      1.    *Whether Plaintiffs have asserted a viable RICO claim*
            *against MMC-Japan, and whether this Court may exercise*
            *personal jurisdiction over MMC-Japan* . . . . . . 64
      2.    *Whether Plaintiffs' Alter-Ego claim is viable* . . . 75

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 76

**HILLMAN**, District Judge

Presently before the Court are the renewed motions of Defendants Mitsubishi Motors North America, Inc. and Defendant Mitsubishi Motors Credit of America, Inc. to dismiss Plaintiffs' Complaint for failure to state a claim pursuant to Federal Civil Procedure Rule 12(b)(6).  Also before the Court is the renewed motion of Mitsubishi Motors Corporation to dismiss Plaintiffs' Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) and for failure to state a claim pursuant to Rule 12(b)(6).  For the reasons expressed below, Defendants' motions will be granted in part, denied in part, and continued in part.

## I.   BACKGROUND

This case involves a failed Mitsubishi automobile dealership.  Plaintiffs Gregory Morrett, Richard Hess, and Darlene Hess ("individual plaintiffs") owned and operated Vineland Mitsubishi, a Mitsubishi Motors automobile dealership incorporated under the corporate entity of Darrick Enterprises ("corporation plaintiff" or "Vineland").  The dealership opened in 2001, but closed in 2004.  Plaintiffs blame the failure of their dealership on Defendants Mitsubishi Motors Corporation ("MMC-Japan"), Mitsubishi Motors North America, Inc. ("MMNA"), and Mitsubishi Motors Credit of America, Inc. ("MMCA").

Plaintiffs filed a Complaint against Defendants, claiming that they violated the New Jersey Consumer Fraud Act, the New

3

Jersey Franchise Practices Act, and the Automobile Dealers' Day in Court Act. Plaintiffs also allege claims for fraud, breach of contract, and breach of the implied covenant of good faith and fair dealing. Specifically, Plaintiffs claim that Defendants fraudulently induced them into opening the Mitsubishi franchise dealership by making various misrepresentations. Plaintiffs also claim that when they operated the dealership, Defendants required Plaintiffs to unnecessarily construct a new facility, they "dumped" unordered new cars on them, and they forced them to participate in a financially unsound financing program.

After Defendants filed motions to dismiss Plaintiffs' Complaint, Plaintiffs filed a First Amended Complaint, which added claims under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and New Jersey state RICO statute. Defendants again moved to dismiss the added RICO claims, as well as all of Plaintiffs' other claims.

In a January 19, 2007 Opinion and Order, the Court dismissed without prejudice Defendants' motions, and directed that Plaintiffs file a RICO Case Information Statement and a Rule 12(e) more definite statement as to the individual plaintiffs' claims. The Court also directed the parties to brief the status and effect of concurrently pending bankruptcy and state court proceedings, both of which involve issues arising out the Mitsubishi dealership. Defendants renewed their motions to

4

dismiss, and oral argument was held.  Defendants' motions are now
ripe for resolution.

## II.  ANALYSIS

Despite the voluminous briefing and lengthy oral argument
that has been conducted in this case, it must not be forgotten
that the Court has only been tasked to decide whether Plaintiffs'
claims should be dismissed pursuant to Federal Civil Procedure
Rule 12.  Thus, the primary issue that must be determined is
whether Plaintiffs' Complaint gives Defendants fair notice of
their claims, and "'not whether [Plaintiffs] will ultimately
prevail but whether [Plaintiffs are] entitled to offer evidence
to support the claim.'"  Bell Atlantic v. Twombly, 127 S. Ct.
1955, 1969 n.8 (2007).  In doing so, the Court must accept all
well-pleaded allegations as true and view them in the light most
favorable to Plaintiffs.  Evancho v. Fisher, 423 F.3d 347, 351
(3d Cir. 2005).  Furthermore, the Court must only consider the
facts alleged in the pleadings, the documents attached thereto as
exhibits, and matters of judicial notice.  Southern Cross
Overseas Agencies, Inc. v. Kwong Shipping Group Ltd., 181 F.3d
410, 426 (3d Cir. 1999).

With this standard in mind, each of the Defendants' motions
will be addressed in turn.

### A.  MITSUBISHI MOTORS OF NORTH AMERICA'S MOTION TO DISMISS

Plaintiffs have asserted ten counts against MMNA for state

and federal RICO violations (Counts I, II, VI, VII), fraudulent
concealment and fraudulent misrepresentation (Count III),
violations of the New Jersey Consumer Fraud Act ("CFA") (Count
IV), violations of the New Jersey Franchise Practices Act ("FPA")
(Count V), breach of contract (Count VIII), violations of the
Automobile Dealers' Day in Court Act ("ADDCA") (Count XI), and
declaratory relief (Count XIII).

Originally, MMNA moved to dismiss all ten counts for
numerous reasons: 1) Morrett and the Hesses cannot assert claims
for injuries that result from direct injury to the dealership
corporation; 2) Morrett has no basis to pursue any claim because
it has not been alleged that he had invested any assets in the
dealership in 2001 when it was formed; 3) Plaintiffs' fraud-based
claims are based on purported statements by MMNA concerning
future performance; 4) Plaintiffs' RICO claims do not allege a
pattern of racketeering activity; 5) Plaintiffs' fraud and RICO
claims do not meet the heightened pleading standard of Fed. R.
Civ. P. 9(b); 6) Plaintiffs' claim under ADDCA fails because
Plaintiffs have not and cannot allege the required "threats,
intimidation, or coercion"; and 7) Plaintiffs' Franchise
Practices Act and breach of contract claims fail because they
have not alleged any actionable conduct by MMNA.

On its renewed motion to dismiss, MMNA has also argued that
Plaintiffs signed a general release, which bars all their claims

6

against it.  MMNA also contends that Vineland's warranty reimbursement claim must fail because it has not stated a valid claim under the Franchise Practices Act, and it is judicially estopped from asserting that claim.

      **1.**    ***Whether Vineland has adequately pleaded common law fraud claims and RICO***[1]

        **a.**    **Common law fraud**

The standard for establishing a claim of common law fraud, fraudulent misrepresentation, and fraudulent inducement is the same:  a plaintiff must prove (1) a material misrepresentation of a presently existing or past fact, (2) with knowledge of its falsity and with the intention that the other person rely on it, and that there was in fact both (3) reasonable reliance and (4) resulting damages.  <u>Banco Popular N. Am. v. Gandi</u>, 876 A.2d 253, 260 (N.J. 2005); <u>Jewish Center of Sussex County v. Whale</u>, 432 A.2d 521, 524 (N.J. 1981).  MMNA argues that Vineland's fraud claims must fail because it has only alleged "future-looking" statements rather than actual facts, and statements of future intent are not actionable.  Vineland argues that it has sufficiently pleaded its fraud claims.

In the RICO case statement, which also serves as a pleading, <u>see</u> Local Civ. R. Appendix O, and which was filed by order of the

_____

[1]Whether the individual plaintiffs' fraud and RICO claims survive MMNA's motion is addressed in Section A.1.3, which addresses the viability of all of the individual plaintiffs' claims.

Court to more particularize Plaintiffs' claims, Vineland has

alleged the following claims specific to MMNA:

> MMNA fraudulently induced numerous prospective dealers,
> including Plaintiffs, to become part of the Mitsubishi
> Dealer Network through a practice of misrepresenting
> the potential for sales of Mitsubishi automobiles and
> light trucks in the market area for a dealership or
> proposed dealership point. For example, throughout
> 2001, while Morrett and the Hesses investigated opening
> a dealership in Vineland, MMNA's representatives,
> including Matt Kloda, represented to Morrett that the
> Vineland market could support the sale of over 400 new
> Mitsubishi motor vehicles on a yearly basis and at
> profitable rates. Further, on September 1, 2001, MMNA
> provided Morrett with a Dealer Sales Plan that
> represented that the Vineland market could support the
> sale of 447 Mitsubishi vehicles per year. However,
> MMNA's own internal documents reflected that the
> Vineland market would only support the sale of 166 new
> Mitsubishi vehicles per year.

> MMNA fraudulently induced numerous prospective dealers,
> including Plaintiffs, to become part of the Mitsubishi
> Dealer Network through a practice of misrepresenting
> the health of the Mitsubishi brand. Specifically, in a
> national dealer meeting held in Las Vegas in the Spring
> of 2001, representatives of MMNA, including then
> President Pierre Gagnon and later President Greg
> O'Neill informed prospective dealers (including Morrett
> and Richard Hess) that Mitsubishi was the fastest
> growing Japanese brand on the market and that by 2005
> MMNA would be selling 500,000 units per year in the
> United States. These MMNA representatives failed to
> disclose the fact that Mitsubishi was actively engaged
> in a fraudulent scheme to conceal significant defects
> in Mitsubishi products which took the form of, inter
> alia, conducting "secret recalls" whereby Mitsubishi
> service centers were informed to replace defective
> parts when Mitsubishi vehicles were brought in for
> routine service or for service unrelated to the
> affected parts, and by failing to disclose these
> defects to the proper authorities.  When MMC's secret
> recalls and defects came to light, the Mitsubishi brand
> name suffered worldwide and particularly in the United
> States.

MMNA fraudulently inflated its reported operating profits by routinely "dumping" unordered Mitsubishi automobiles and light trucks on members of the Mitsubishi Dealer Network. Specifically, MMNA would systematically invoice members of the Mitsubishi Dealer Network for Mitsubishi motor vehicles that had not been ordered by the dealers. For example, on March 31, 2003, MMNA invoiced roughly twice the amount of automobiles it should have to the Mitsubishi Dealer Network. This amounted to billing by MMNA for approximately 30,000 automobiles to hundreds of dealers in a single day.

Between 2000-2004, MMNA fraudulently represented the overall sales of Mitsubishi motor vehicles in monthly Sales & Retention Results for Retail Sales that were mailed to members of the Mitsubishi Dealer Network by including in its summaries, the sales of Mitsubishi motor vehicles that were subject to fleet sales and/or wholesales. These inflated and misleading sales figures were also used to recruit new Mitsubishi dealers.

(RICO Case Statement at 1-2.)

These allegations, in conjunction with the allegations in Plaintiffs' First Amended Complaint, sufficiently state a claim against MMNA for fraudulently inducing Vineland to establish the dealership in 2001 with the Interim Dealer Sales Agreement, and to expand the dealership and enter into the June 2003 Dealer Sales and Service Agreement.  MMNA's is correct that an "alleged fraudulent representation must relate to some past or presently existing fact and cannot ordinarily be predicated upon matters *in futuro*," Ocean Cape Hotel Corp. v. Masefield Corp., 164 A.2d 607, 612 (N.J. Super. App. Div. 1960), and Vineland has sufficiently pleaded "past fact."  With regard to the 2001 Interim Dealer Sales Agreement, Vineland has sufficiently pleaded that (1) MMNA knowingly misrepresented the number of vehicles the Vineland

9

market could support, (2) MMNA intended that Vineland rely on
that number in determining whether to open a Mitsubishi
dealership, (3) Vineland did rely on this representation, (4) and
had damages as a result.[2]  Vineland also has sufficiently alleged
that with regard to entering into the 2003 Dealer Sales and
Service Agreement, MMNA consistently misrepresented the health of
the Mitsubishi brand to entice Vineland, to its detriment, to
enter into a second dealership agreement, purchase land, and
construct a new facility.

### b. RICO

To prove a RICO case is more onerous than common law fraud,
however.  The RICO statute provides,

> It shall be unlawful for any person employed by or
> associated with any enterprise engaged in, or the
> activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's affairs
> through a pattern of racketeering activity or
> collection of unlawful debt.

18 U.S.C. § 1962(c).  It is also unlawful for anyone to conspire

---

[2]MMNA argues that Plaintiffs knew the difference between
the sales forecast of 447 cars (which is the potential
performance of a dealer in the marketplace) and planning volume
of 166 cars (a more conservative figure used in connection with
calculating the dealership's working capital needs) because both
numbers appeared in the Working Capital Work Sheet in advance of
the execution of the ISSA.  At oral argument, it was clarified
that Plaintiffs are claiming that MMNA's alleged
misrepresentation was not that they were not told of the
difference between potential performance and actual performance,
but rather that no market studies supported the potential
performance number.  (Tr. at 39-41.)

to violate § 1962(c).  See 18 U.S.C. § 1962(d).

In order to adequately plead a violation of RICO, a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, and a pattern of racketeering activity requires at least two predicate acts of racketeering.  Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004) (citing Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985); 18 U.S.C. § 1961(5)).  These predicate acts of racketeering may include, inter alia, federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343.  See 18 U.S.C. § 1961(1).  The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud.  See 18 U.S.C. §§ 1341, 1343.  "'A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension.'"  Lum, 361 F.3d at 223 (citation omitted).

The Third Circuit has instructed that where a plaintiff relies on mail and wire fraud as a basis for a RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity.  Id.  In order to satisfy Rule 9(b), a plaintiff must plead with particularity "the 'circumstances' of

11

the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Id. at 223-24 (citation and quotations omitted).  A plaintiff may satisfy this requirement by pleading the "date, place or time" of the fraud, or through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Id. at 224 (citation omitted). A plaintiff must "also must allege who made a misrepresentation to whom and the general content of the misrepresentation." Id. (citations omitted).

As stated above, pursuant to the Court's order, Plaintiffs filed a RICO Case Information Statement, which explains with particularity Plaintiffs' RICO claims.  Plaintiffs allege that MMNA violated 18 U.S.C. § 1962(c), and that all Defendants violated 18 U.S.C. § 1962(d) (conspiracy to violate § 1962(c)). With regard to Vineland's injuries, it claims the following,

> Vineland Mitsubishi was formed by Greg Morrett, Richard Hess and Darlene Hess to serve as a Mitsubishi dealership that became part of the Mitsubishi Dealer Network. As a result of Defendants' unlawful conduct, Vineland Mitsubishi became a Mitsubishi dealer, invested significant funds of roughly $1 million in operations, suffered significant losses and lost profits, and was ultimately forced out of business.
> Vineland Mitsubishi would not have entered its relationship with MMNA and MMCA had Defendants disclosed MMC's 20 year pattern of deceit and corruption regarding the "secret recalls" of Mitsubishi motor vehicles. Vineland Mitsubishi also relied upon MMNA's false statements regarding its studies of the

12

Vineland Mitsubishi market and MMNA's
misrepresentations regarding the sale of Mitsubishi
motor vehicles in the United States. All of these
misrepresentations induced Vineland Mitsubishi to make
its considerable investment in operating a Mitsubishi
dealership.

Additionally, MMNA, in tandem with MMCA "dumped"
unordered vehicles on Mitsubishi dealers, including
Vineland Mitsubishi. Vineland Mitsubishi was forced to
pay for the unordered vehicles, which it did not want
or need and which it could not afford. These unordered
vehicles then sat unsold on Vineland Mitsubishi's lot
resulting in excess financing charges which increased
the cost of the vehicles to Vineland Mitsubishi and, in
turn, eroded or eliminated Vineland Mitsubishi's profit
upon resale of the vehicles. MMCA also imposed
financing charges and interest on Vineland Mitsubishi
for cars that had not yet been delivered to Vineland
Mitsubishi.

MMNA's "dumping" of vehicles on Vineland
Mitsubishi not only significantly drove up Vineland
Mitsubishi's costs of goods, but it also forced
Vineland Mitsubishi to further discount its prices on
new Mitsubishi vehicles in an attempt to sell vehicles
more quickly and thereby minimize the finance charges
incurred on such vehicles. The net result of these
practices was enormous financial pressure on Vineland
Mitsubishi.  Ultimately, as was the case with many
other similarly situated Mitsubishi dealers, Vineland
Mitsubishi was forced out of business because of this
misconduct.

(RICO Case Information Statement at 6-7.)  Plaintiffs also allege

that Mitsubishi dealers located throughout the United States have

suffered the same injuries.  (Id. at 9-10.)

Plaintiffs allege that MMNA's and MMCA's predicate acts

constituted sending materials related to this fraudulent scheme

by postal service, commercial interstate carries, by wire, and

other electronic media, in violation of 18 U.S.C. § 1341 (mail

fraud) and 18 U.S.C. § 1343 (wire fraud).  (Id. at 11.)

13

Plaintiffs claim that these materials were a part of MMNA's effort to obtain new Mitsubishi dealers by concealing MMC-Japan's corruption and by misrepresenting the market for Mitsubishi motor vehicles. (Id.)  Plaintiffs identify six letters sent from MMNA to them in 2001 with respect to MMNA's efforts to establish Plaintiffs as a Mitsubishi dealer. (Id. at 12.)  Plaintiffs also claim that similar communications were sent to other Mitsubishi dealers throughout the United States.

During the period of 2001 through 2004, after Vineland had entered into first the interim dealer agreement and then the Dealer Sales and Service Agreement, Plaintiffs claim that MMNA regularly sent them materials by wire or mail representing the sale of Mitsubishi vehicles throughout the United States, and these materials were part of MMNA's scheme to dump unordered cars upon Vineland with the assistance of MMCA and the apparent knowledge of MMC-Japan. (Id.)  Plaintiffs identify three categories of materials, including monthly invoices, monthly sales and retention results, and monthly financial analyses. (Id. at 12-13.)

Next, Plaintiffs set forth how MMNA's alleged predicate acts formed a pattern of racketeering activity, and explain how an "enterprise" exists.  First, with regard to whether an enterprise exists, Plaintiffs contend that the "Mitsubishi Dealer Network," comprised of Mitsubishi dealers throughout the country, is the

14

enterprise.  (Id. at 16.)  Second, with regard to the pattern of
racketeering activity, Plaintiffs allege a pattern that can be
classified into two categories--(1) MMNA's false representations
and fraudulent concealment of MMC-Japan's corrupt practices, the
health of the brand, defects and secret recalls, and its national
sales and market studies, and (2) MMNA, with MMC-Japan's
knowledge and MMCA's assistance, dumping of unordered cars on
dealers.  (Id. at 15-16.)  Plaintiffs argue that the numerous
mailings from MMNA were related to this alleged racketeering
activity.  (Id. at 15.)  Plaintiffs also allege that these acts
also form a conspiracy between all three defendants.  (Id. at
21.)

        MMNA has moved to dismiss Plaintiffs' RICO claims.  MMNA's
main argument, as noted above, is that Plaintiffs knew the
difference between the sales forecast of 447 cars (which is the
potential performance of a dealer in the marketplace) and
planning volume of 166 cars (a more conservative figure used in
connection with calculating the dealership's working capital
needs) because both numbers appeared in the Working Capital Work
Sheet in advance of the execution of the ISSA.  MMNA argues that
"these documents establish conclusively that Vineland knew that
the sales forecast was not a promise by MMNA that Vineland would
achieve any particular level of sales," and that the "difference
between the sales forecast and planning volume were fully

15

disclosed to Vineland."  (MMNA's Renewed Mot. Dismiss at 10,
Docket No. 49.)   Because Plaintiffs knew of the difference, MMNA
argues that this cannot be a basis for fraud.

At oral argument, however, it was clarified that Plaintiffs
are claiming that MMNA's alleged misrepresentation was not that
they were not told of the difference between potential
performance and actual performance, but rather that no market
studies supported the potential performance number.  (Tr. at 39-
41.)  Plaintiffs argue that this misrepresentation, along with
MMNA's concealment of MMC-Japan's troubles and the
misrepresentation of the health of the brand, and facilitated by
mailings supporting this fraud, constitute a RICO violation.  To
put it succinctly, Plaintiffs contend that "but for the
concealment of this corruption, Plaintiffs would not have
invested their life savings in forming a Mitsubishi dealership,"
and Plaintiffs would not have made an investment in the
Mitsubishi brand "had they known about MMC's secret recalls and
other unlawful conduct."  (Pl.'s Opp. at 11, Docket No. 54.)

### 1.  *Whether Plaintiffs have adequately established an existence of an enterprise*

The RICO statute defines "enterprise" as including "any
individual, partnership, corporation, association, or other legal
entity, and any union or group of individuals associated in fact
although not a legal entity."  18 U.S.C. § 1961.  At the motion
to dismiss stage, it is enough that a plaintiff state what

16

entities it believes constitute an enterprise--a plaintiff does
not have to allege the elements to prove that an enterprise
actually exits.[3]  Seville Indus. Machinery Corp. v. Southmost
Machinery Corp., 742 F.2d 786, 789-90 (3d Cir. 1984) (reversing
district court's dismissal of plaintiff's RICO claim because it
failed to allege the three elements to prove the existence of an
enterprise because "the district court confused what must be
pleaded with what must be proved," and holding that the plaintiff
sufficiently pleaded the entities it believed constituted an
enterprise).

Here, Plaintiffs claim that the enterprise is the Mitsubishi
network of dealers, consisting of all Mitsubishi dealers and
including the business corporations, business associations,
partnerships and individuals that held Mitsubishi franchises, and
it "functions as a continuing unit for the legitimate purpose of
distributing Mitsubishi vehicles to the general public, and it is
bound by the identical sales and service agreements."  (First
Amended Compl. at 141-44; RICO Case Statement at 17.)  Plaintiffs
further allege that MMNA is the "person" that conducts the

---

[3]In order to establish the existence of an enterprise, a
plaintiff must prove: 1) that the enterprise is an ongoing
organization with some sort of framework or superstructure for
making or carrying out decisions; 2) that the members of the
enterprise function as a continuing unit with established duties;
and finally 3) that the enterprise must be separate and apart
from the pattern of activity in which it engages.  Seville, 742
F.2d at 789-90.

17

enterprise's affairs through a pattern of racketeering activity. (<u>Id.</u>)  These claims are sufficient to state a claim of a RICO enterprise.

> **2.   Whether Plaintiffs have adequately established the appropriate predicate acts and a pattern of racketeering activity by MMNA[4]**

As mentioned above, Plaintiffs' pattern of racketeering activity can be separated into two categories--1) MMNA's false representations and fraudulent concealment of MMC-Japan's corrupt practices, the health of the brand, defects and secret recalls, and its national sales and market studies, and (2) MMNA, with MMC-Japan's knowledge and MMCA's assistance, dumping unordered cars on dealers.  The predicate acts of racketeering include the numerous mailings from MMNA that were related to this alleged racketeering activity.

### a.   Predicate acts

Plaintiffs claim that MMNA committed federal mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, when it communicated with them, as well as other dealers, regarding the establishment of the dealership franchise.  Violations of the mail and wire constitute predicate offenses under federal RICO, 18 U.S.C. § 1961(1), and the state law, N.J.S.A. 2C:41-1(2)

---

[4]Plaintiffs' RICO claims against MMCA and MMC-Japan are discussed separately below.

(incorporating by reference federal list of racketeering activities).  To allege mail or wire fraud, a plaintiff must describe: 1) the existence of a scheme to defraud, 2) the use of the mails or wires in furtherance of the fraudulent scheme, and 3) culpable participation by the defendants.  Emcore Corp. v. PricewaterhouseCoopers, LLP, 102 F. Supp. 2d 237, 245 (D.N.J. 2000) (citing U.S. v. Pearlstein, 576 F.2d 531, 534 (3d Cir. 1978) (other citations omitted).  "To be part of the execution of [mail] fraud . . . the use of the mails need not be an essential element of the scheme.  It is sufficient for the mailing to be 'incident to an essential part of the scheme,' or 'a step in [the] plot.'"  Id. (quoting Schmuck v. United States, 489 U.S. 705, 710-11 (1989)) (quotations omitted).  Further, even "completely 'innocent' mailings" (those that contain no false information) can satisfy the mailing element.  Id. (citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir. 1991) (other citations omitted).  Thus, "[a] scheme or artifice to defraud 'need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.'"  Id. (quoting Kehr Packages, 926 F.2d at 1415 (quotations and other citations omitted).

Here, the materials described above and detailed in Plaintiffs' RICO Case Information Statement and First Amended

19

Complaint--materials MMNA regularly sent Plaintiffs representing the sale of Mitsubishi vehicles throughout the United States, and monthly invoices, monthly sales and retention results, and monthly financial analyses--are sufficient to state the requisite predicate acts to maintain a RICO claim because they are incidental to, and an essential part of, the alleged scheme.

### b. Pattern of racketeering activity[5]

"[T]o prove a pattern of racketeering activity a plaintiff must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 239 (1989). Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. at 240. "The continuity requirement is satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating

---

[5]Plaintiffs have also asserted claims under the state RICO statute. Because "it appears that the New Jersey definition of pattern is more flexible and generous to plaintiffs than the federal standard," Emcore Corp. v. PricewaterhouseCoopers, LLP, 102 F. Supp. 2d 237, 255 (D.N.J. 2000), and the Court has found that Plaintiff has sufficiently pleaded a pattern of racketeering under the federal statute, a separate analysis for the state version of the statute is unnecessary.

in an ongoing and legitimate RICO 'enterprise.'" Id. at 243.
Thus, "the ambit of RICO may encompass a 'legitimate' businessman
who regularly conducts his business through illegitimate means,
that is, who repeatedly defrauds those with whom he deals and in
the process commits predicate acts, for instance by using the
postal service as a means of accomplishing his scheme." Tabas v.
Tabas, 47 F.3d 1280, 1293 (3d Cir. 1995).

Plaintiffs claim that MMNA used the mail and wire under the
guise of its legitimate business of establishing and maintaining
Mitsubishi dealerships to make false representations and to
conceal MMC-Japan's corrupt practices, the health of the brand,
defects and secret recalls, and its national sales and market
studies.  Plaintiffs also claim that MMNA used the mail and wire
to control and conduct the affairs of the Mitsubishi dealership
network by dumping unordered cars on dealers with MMC-Japan's
knowledge and MMCA's assistance.

The predicate acts of communications with Plaintiffs and
other dealerships regarding the establishment of the dealership
and the monthly financial information sent thereafter were MMNA's
regular way of conducting its business and are related to the
enterprise.  As such, these claims are sufficient to state a
claim that MMNA engaged in a pattern of racketeering in violation
of RICO.  This is especially true considering the standard on a
motion to dismiss, as well as the fact that "in many cases

21

plaintiffs will be able to withstand a facial attack on the
complaint and have the opportunity to have their pattern
allegations threshed out in discovery." Swistock v. Jones, 884
F.2d 755, 758 (3d Cir. 1989) (citing Seville, 742 F.2d at 790,
which adopted a generous standard of review of RICO "enterprise"
allegations at motion to dismiss stage). Consequently,
Vineland's RICO claim against MMNA stands.

> 2. ***Whether the General Release Bars Plaintiffs' Claims***

MMNA argues that a general release signed by Plaintiffs
compels the dismissal of all of their claims. On June 3, 2003,
Plaintiffs executed a Dealer Sales and Service Agreement
("DSSA"), which contained a provision whereby Vineland Mitsubishi
released "any and all claims, demands, contracts and liabilities
(including, but not limited to, statutory liabilities), known or
unknown, of any kind or nature whatsoever, arising from or out of
or in connection with any such prior agreements, business
transactions, course of dealing, discussions or negotiations
between the parties prior to the effective date." (Ex. B to
First Amended Complaint.) MMNA argues that since general
releases are valid under California law, which is the law of
choice provided for in the DSSA, as well as New Jersey law, and
because Plaintiffs were aware of all their claims prior to
executing the DSSA, but did so nonetheless, their claims are
barred by the release.

22

Plaintiffs contest the application of the release for four reasons: (1) it does not apply to the individual claims, (2) the New Jersey Franchises Practices Act ("FPA") expressly prohibits franchisors from requiring franchisees to execute a release in order to enter a franchise agreement, (3) under both California and New Jersey law, a party cannot enforce a release in an agreement against a party fraudulently induced to enter the agreement, and (4) the release does not cover claims accruing after June 3, 2003.

MMNA's use of the release to bar all of Plaintiffs' claims against it is premature.  First, as Plaintiffs argue, the release does not bar the individual claims because it applies only to Vineland, and it does not cover claims arising out of MMNA's alleged conduct after June 3, 2003.  Second, because Plaintiffs have sufficiently pleaded they were fraudulently induced to enter an agreement that contained a release provision, the release cannot be used to defeat Plaintiffs' claims on a motion to dismiss.  See Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Dev. Corp., 38 Cal. Rptr. 2d 783, 788 n.7 (Cal. App. 1995); Ocean Cape Hotel Corp. v. Masefield Corp., 164 A.2d 607, 611 (N.J. Super. Ct. App. Div. 1960) ("It is well settled that a party to an agreement cannot, simply by means of a provision in the written instrument, create an absolute defense or prevent the introduction of parol evidence in an action based on fraud in the

23

inducement to contract.").[6]  If MMNA ultimately proves that
Plaintiffs were not fraudulently induced to enter into the DSSA,
then MMNA may assert this release as a defense to other claims of
the corporation, but it does not serve to bar all of Plaintiffs'
claims at this stage in the litigation.

### 3.  *Individual Plaintiffs' Claims*

The individual plaintiffs have asserted claims under the
common law and state and federal RICO for MMNA's alleged fraud
(collectively referred to as the individual plaintiffs' fraud
claims), and for violations of the Automobile Dealers' Day in
Court Act, New Jersey's Consumer Fraud Act and New Jersey's
Franchise Practices Act (collectively referred to as the
individual plaintiffs' statutory claims).  In its original motion
to dismiss, MMNA argued that the individual plaintiffs failed to
allege that these claims were distinct from the claims of
Vineland.  Also finding it difficult to discern the individual
claims from the corporation's claims, the Court ordered the
individual plaintiffs to file a more definite statement pursuant
to Rule 12(e), specifying what claims each individual plaintiff
maintained separate from those of the corporation.  (Opinion at

---

[6]Because the release does not bar Plaintiffs' claims at this
point in the case because of Plaintiffs' allegations of
fraudulent inducement, it is unnecessary to determine now whether
the New Jersey FPA would also invalidate the release. The Court
also does not rule on any choice of law issues.

9-10.)  The individual plaintiffs complied with the Court's
order, but MMNA has renewed its motion to dismiss, arguing that
the more definite statement still fails to state a claim for the
individual plaintiffs.

### a.    The individual plaintiffs' fraud claims

It is black letter law that shareholders are not permitted
to assert claims that belong to the corporation--only the
corporation, either directly or derivatively, can assert its
claims.  In re Kaplan, 143 F.3d 807, 812 (3d Cir. 1998).  This
rule, however, does not bar a shareholder's claim if he seeks to
recover for injuries that were inflicted on him individually
rather than on the corporation.  Id. (citing Kroblin Refrigerated
Xpress, Inc. v. Pitterich, 805 F.2d 96, 104 (3d Cir. 1986)).

For example, in Moffatt Enterprises, Inc. v. Borden, Inc.,
807 F.2d 1169, 1171 (3d Cir. 1987), three brothers formed a
corporation to distribute the defendant's insulation product.  As
business grew, one of the brothers quit his job to work full-time
for the corporation, and a year later, based on the defendant's
assurances of the safety of the insulation product, the other two
brothers quit their jobs to devote full time to their
corporation.  Moffatt, 807 F.2d at 1172.  During the following
year, the defendant experienced a dramatic downturn in
profitability due to health concerns caused by the insulation,
but the defendant concealed these issues from the plaintiffs, as

well as its decision to discontinue the product, and urged the
plaintiffs to enlarge their distribution area.  Id.  Based on
these representations, the plaintiffs purchased bulk equipment to
prepare for the expanded territory.  Id.  The plaintiffs heard
rumors about defendant's issues, and asked one of the defendant's
salesmen about it, who denied the reports and encouraged the
plaintiffs to attend an upcoming trade show.  Id.  Two weeks
after the trade show, the defendant notified the plaintiffs that
it would stop producing the insulation product at the end of the
month.  Id. at 1173.

The plaintiffs filed suit against the defendant, claiming,
inter alia, that the defendant fraudulently induced them to enter
into the distributor agreement.  Id. at 1173.  The plaintiffs
claimed, as individuals, that they sustained actual and
consequential damages resulting from the loss of funds in
developing the corporation, as well as relinquishing their full-
time jobs.  Id. at 1176-77.  In deciding the defendant's motion
for summary judgment, the district court held that the brothers
lacked standing to sue the defendant because their alleged
injuries arose from harm to their corporation.  Id. at 1176.  On
appeal, the Third Circuit reversed, stating that "quite apart"
from the defendant's alleged wrongdoings toward the plaintiff
corporation, the brothers "manifestly suffered harm in their
individual capacities."  Id. at 1177.  Quoting another Third

26

Circuit case, the court explained,

> It is hornbook law that claims asserted for the benefit
> of stockholders *qua* stockholders in a corporation
> because of the tortious acts of its officers or those
> actions in conjunction with them is a class suit, a
> derivative action, and recovery is for the benefit of
> the corporation directly and indirectly to its
> stockholders.  It is equally clear that where a
> corporation, tortiously conspires with others to damage
> an individual and does so a cause of action arises
> which belongs to the individual. [Footnotes omitted.]
> Recovery can then be had by the individual against the
> corporation.

Id. (quoting Davis v. United States Gypsum Co., 451 F.2d 659 (3d

Cir. 1971)).  As a result, the court remanded the case to the

district court, holding that the brothers were able to pursue

their individual claims.   Id.

     Here, the individual plaintiffs have alleged that MMNA,

among other things, fraudulently induced them into entering into

the dealership agreement.  Attendant to entering into that

agreement, the Hesses claim that they personally spent over

$200,000 to purchase the land on which a new facility was built

for the Vineland dealership, as well as other additional

expenditures.  Morrett alleges that based on MMNA's

misrepresentations, he gave up his previous employment to conduct

the operations of the Vineland dealership, losing the salary he

would have earned had he not left.  The individual plaintiffs

contend that these losses are separate and distinct from the

corporation's claims, and as such, should be permitted to proceed.

MMNA argues, however, that with regard to the Hesses' $200,000 property investment, county records show that the corporation, and not the Hesses, bought the land.  The county records show that the land was purchased by Vineland for $325,000 on July 26, 2002, and it was transferred to Mitzu Properties, LLC, the officers of which are the Hesses, for $100 on March 10, 2003.  Based on these records, MMNA argues that the claimed loss of the Hesses is not theirs, but either Vineland's or Mitzu's. Because a court may take judicial notice of public records and consider them in deciding a motion to dismiss, and these records defeat the Hesses's claim of alleged losses, MMNA argues that the Hesses's claims should be dismissed.  Further, with regard to the Hesses's other losses, MMNA argues that they are not losses, but rather "investments," and are not alleged distinct from the corporation's alleged losses.[7]

With regard to Morrett's alleged personal loss that he left

---

[7]MMNA also argues that the Hesses's individual claims are barred because they are seeking damages for not only their initial capital investment, but also losses associated with the operation of the dealership corporation in succeeding years. MMNA cites no authority for this distinction, and in Moffatt, the Third Circuit permitted the individual claims of the shareholders for actual and consequential damages resulting from the loss of funds in developing the corporation.  Moffatt, 807 F.2d at 1176-77.

his job in 2001 to become the general manager at Vineland, MMNA argues that because Morrett did not become a shareholder until 2003, <u>Moffatt</u> does not save him, and, consequently, he does not have any actionable claim.

The individual plaintiffs contest MMNA's arguments.  First, the Hesses explain that they entered the agreement of sale for the land personally, and that even though the deed to the property was initially in Vineland's name, it was transferred to Mitzu, which is wholly owned by the Hesses.  Thus, the Hesses argue that not only did they adequately plead that they have suffered significant losses--as personal guarantors of the corporation, in forming the Vineland Mitsubishi corporation, and in connection with the purchase of the land and the construction of the building--to withstand MMNA's motion to dismiss, they contend that the county records raise an issue of material fact that must be resolved at the summary judgment stage or at trial, rather than on a motion to dismiss.[8]  Second, Morrett argues that he has adequately pleaded his lost income and personal guarantee to defeat MMNA's motion, and that Morrett's status as an employee of Vineland at the time of the corporation's formation does not defeat his claim.

_____

[8]Plaintiffs also request permission to amend their Complaint to add Mitzu as an additional plaintiff.  Should Plaintiffs still wish to pursue this request, Plaintiffs are instructed to file a formal motion pursuant to Rule 15(a) seeking leave to amend.

Based on the motion to dismiss standard and <u>Moffatt</u>, the
Hesses's and Morrett's individual claims are sufficient to
survive MMNA's motion to dismiss.  The Hesses allege that but for
the fraudulent representations of MMNA, they would have never
created the corporation and invested their personal funds into
establishing the dealership, including the purchase of the
property to build the new building and the execution of a
personal guarantee for the debts of the corporation.  Taking
these allegations as true, the Hesses have adequately pleaded
harm that is distinct from the corporation, and they are entitled
to offer evidence to support their claims arising out of this
alleged fraud.  MMNA may be able to demonstrate that the Hesses
did not actually suffer their alleged losses, including the issue
concerning the ownership of the land, but that must be done at
summary judgment or trial.[9]

Morrett's individual claim for injuries sustained from
MMNA's fraudulent representations survives for a different reason
than the Hesses's claim.  MMNA argues that because Morrett was
not a shareholder when the corporation was formed in 2001, but
merely an employee, and he did not become a shareholder until

---

[9]MMNA points out that the Hesses's personal guarantee
executed in connection with the loan agreement with MMCA may
serve as a possible loss, but that loss is not ripe and is
limited.  Whether the Hesses will ultimately prevail in
establishing their loss is not for the Court to decide on this
motion to dismiss.

2003, he does not have standing to pursue individual damages resulting from MMNA's alleged fraudulent inducement to establish the dealership.  MMNA is correct that <u>Moffatt</u> instructs that only a shareholder may have claims separate from the corporation for injuries inflicted upon him individually.  That distinction, however, is only potentially fatal to Morrett's individual injuries that arose after 2003 when he became a shareholder. <u>Moffatt</u> does not comment on whether an employee of a corporation which was created based on fraud can maintain an action against the perpetrator of that fraud.  In other words, <u>Moffatt</u> does not bar Morrett, as an employee of Vineland, from suing MMNA for its tortious conduct towards Vineland.  <u>Moffatt</u> also does not bar Morrett from suing MMNA for alleged fraudulent representations MMNA made to him that caused him to leave his job as a sales manager at another dealership to become an employee of Vineland Mitsubishi.  Whether other case law bars such claims has not been brought to the Court's attention.[10]  Consequently, Morrett's individual claims arising prior to 2003 survive MMNA's instant motion to dismiss.

    With regard to Morrett's claims arising after he became a

_____

    [10]MMNA states in a footnote in its reply brief that a claim that a former employee of a company that claims to have been the victim of fraudulent inducement also has standing to assert fraud against the alleged perpetrator of the fraud "is simply not the law."  (MMNA Reply Br. at 9 n.3.)  Because the parties have not briefed the issue, the Court takes no position on the viability of such a claim.

shareholder in 2003, Morrett has claimed as damages distinct from the corporation his relinquishment of his job in 2001, as well as his execution of a personal guarantee to MMCA for the debts of Vineland. With regard to his first injury, Moffatt holds that a shareholder's relinquishment of prior employment based on a defendant's misrepresentations states an injury distinct from that of the corporation. Thus, even though MMNA may demonstrate that it is not responsible for Morrett's alleged injury, he has stated a claim sufficient to survive MMNA's motion to dismiss. Similarly, with regard to Morrett's personal guarantee, as noted above with regard to the Hesses's guarantee, MMNA concedes that Morrett may have damages as a result, albeit potentially limited. (Reply at 9-10.) Consequently, the individual plaintiffs' fraud claims withstand MMNA's motion.

### b.   The individual plaintiffs' RICO claims

Because the same alleged conduct forms the basis for the individual plaintiffs' fraud and RICO claims, the individual plaintiffs' RICO claims survive to the same extent as their fraud claims.

### c.   The individual plaintiffs' statutory claims

In addition to the individual plaintiffs' fraud claims, they have asserted claims for violations of New Jersey's Franchise Practices Act, New Jersey's Consumer Fraud Act, and the

32

Automobile Dealers Day in Court Act.  MMNA argues that these claims belong to the corporation and not to the individual plaintiffs.[11]  Plaintiffs argue that the same conduct that supports their fraud claims also supports their statutory claims, and the same damages demonstrate a separate harm remedied by these statutes.

### 1.   Franchise Practices Act

Plaintiffs argue that they have standing to pursue their FPA claims because the FPA provides that "any franchisee may bring an action against its franchisor for violation of this act," and

_____

[11] MMNA also states that the individual plaintiffs have conceded that their FPA and ADDCA claims are Vineland's. (Reply Br. at 8, Docket No. 56.)  To support this contention, MMNA cites to the plaintiffs' opposition brief, where, in the context of whether plaintiffs' warranty claims are barred, plaintiffs state, "Vineland Mitsubishi's warranty claim now belongs to the estate of Vineland Mitsubishi." (Opp. at 30, Docket No. 54.)  MMNA then argues, "[j]ust as the purported warranty claim under the [FPA] 'now belongs to the estate of Vineland Mitsubishi,' so do the other statutory claims under the Franchise Practices Act and Automobile Dealers Day in Court Act." (Reply Br. at 8.)

The Court does not accept this as evidence that the individual plaintiffs have conceded that they have no statutory claims.  The Court construes the plaintiffs' statement only to mean that the corporation's warranty claim under the FPA is now the estate's due to its Chapter 7 status, and not that the individual plaintiffs' FPA and ADDCA claims are also the estate's.  It could be assumed, and plaintiffs' counsel's statements at oral argument appear to agree, that all of the corporation's claims now belong to the estate, but the individual plaintiffs have not conceded that any of their claims are subsumed by the corporation's bankruptcy.  Additionally, MMNA does not argue that the individual plaintiffs have conceded anything with regard to their Consumer Fraud Act claims.  Consequently, it still must be determined whether the individual plaintiffs' statutory claims are viable.

that a "franchisee" is defined as "a person to whom a franchise is offered or granted," and a "person" is defined as "a natural person, corporation, partnership, trust, or other entity and, in case of an entity, it shall include any other entity which has a majority interest in such entity or effectively controls such other entity as well as the individual officers, directors, and other persons in active control of the activities of each such entity."  N.J.S.A. 56:10-3, -10.  The individual plaintiffs argue that because both they and Vineland are "franchisees," they have standing to bring a cause of action for the violation of the FPA.

MMNA does not specifically address this argument, but presents the case Central Jersey Freightliner, Inc. v. Freightliner Corp., 987 F. Supp. 289, 301 (D.N.J. 1997), to support its contention that the individual plaintiffs do not have standing to sue under the FPA.  Central Jersey Freightliner is distinguishable, however.  There, the sole shareholder claimed that his injury was not derivative, but rather personal, because he was a guarantor of the financing transactions and was injured by misrepresentations made by defendant.  Central Jersey Freightliner, 987 F. Supp. at 301.  The court held that the shareholder did not have standing to assert claims under the FPA because "the complaint seeks only damages for the alleged injury to the [corporation]."  Id.

Here, unlike the shareholder in Central Jersey Freightliner,

34

the individual plaintiffs have asserted injuries separate from that of the dealership corporation.  Plaintiffs have alleged that MMNA violated the FPA by imposing an "unreasonable facilities" requirement, and by requiring them to accept cars that were not ordered.  (First Amended Compl. ¶ 179, citing N.J.S.A. 56:10-7.4.)  With regard to the unreasonable facilities violation, the Hesses have alleged that based on MMNA's continued fraudulent misrepresentations about the health of the Mistubishi brand, they invested their own money to buy the land on which to construct a new facility, which was violative of the FPA.  N.J.S.A. 56:10-7.4(a) (prohibiting "any motor vehicle franchisor, directly or indirectly, through any officer, agent or employee, to . . . impose . . . unreasonable facilities . . . upon a motor vehicle franchisee"). Just as this allegation is sufficient to state a claim in their individual capacities for fraud, it is also sufficient to state a claim for a violation of the FPA. Consequently, the Hesses have standing to assert an FPA claim as to the new facility requirement individually.

    With regard to Morrett, it is unclear how he suffered any individual damages with regard to the construction of the facility.  Thus, he does not have standing to pursue an FPA claim.  With regard to the Hesses' and Morrett's claim that MMNA violated the FPA by dumping unordered cars on them, neither has asserted a valid FPA claim against MMNA for the "dumping" of

unordered cars.

## 2.  Automobile Dealers' Day in Court Act

Plaintiffs have also asserted a claim under the Automobile Dealers' Day in Court Act.  Under the ADDCA, "An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, . . . and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer . . . ."  15 U.S.C. § 1222.  Standing is thus limited to an "automobile dealer," which is defined as "any person, partnership, corporation, association, or other form of business enterprise . . . operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons."  15 U.S.C. § 1221(c).

MMNA argues that it is well-established that individual shareholders of a dealership corporation cannot assert a claim under the ADDCA.  Plaintiffs argue that courts have routinely recognized the standing of individuals under the ADDCA where those individuals are deemed essential to the operation of the dealership by the terms of the franchise agreement.

MMNA cites the case <u>Pearson v. Ford Motor Co.</u>, 68 F.3d 1301

36

(11th Cir. 1995) to support its argument, but it is
distinguishable from the case here.  In Pearson, the president
and shareholder of the dealership sued Ford under the ADDCA, but
the court held that he lacked standing.  Pearson, 68 F.3d at
1302.  In making its decision, the court noted that even though
Pearson was the on-site manager and was responsible for the day
to day operations of the dealership, Pearson was never a party to
the dealership franchise agreements with Ford--those agreements
were entirely between Ford and the dealership.  Id. at 1303.
Because of this, the court distinguished York Chrysler-Plymouth,
Inc. v. Chrysler Credit Corp., 447 F.2d 786 (5th Cir. 1971),
which held that the shareholders of a dealership corporation, the
Yorks, did have standing under the ADDCA because although the
Yorks were not signers of the franchise agreement, they were
"inextricably woven into it," and "[i]n essence, the court
concluded that Chrysler had made the Yorks essential to the
operation of the dealership."  Id.   The court held that "[t]his
was manifestly not the case with Pearson, who was in fact
ultimately terminated and replaced."  Id.

    As Plaintiffs point out, the Third Circuit has followed
York.  In Rea v. Ford Motor Co., 497 F.2d 577 (3d Cir. 1974), the
court disagreed with Ford's argument that the shareholder, Rea,
lacked standing under the ADDCA, holding,

    [W]e find Ford's argument on this point does not

37

justify its contention that it is entitled to judgment
on this claim, for it is based on too narrow and
technical an interpretation of who the 'dealer' is
under the facts of this case. Edward C. Rea was not
only a signing party to the franchise agreement between
Ford and Edward C. Rea, Inc., but was made essential to
the operation of the dealership by its terms, which
recited that Ford had entered into the agreement 'in
reliance (i) upon the representation and agreement that
. . . (Edward C. Rea) substantially participate(s) in
the ownership of the Dealer . . . and (ii) upon the
representation and agreement that . . . (Edward C. Rea)
shall have full managerial authority for the operating
management of the Dealer in the performance of this
agreement.' Rea, therefore, had a cause of action under
the Automobile Dealers' Act against Ford for any bad
faith in coercing him, as President and principal
stockholder of Rea Olds, to surrender the Oldsmobile
franchise and to recover damages suffered by Rea Olds
as a result of such surrender.

Rea, 497 F.2d at 584.

The Rea case does not end the analysis, however, because the
holding of Rea and the York line of cases have been widely
criticized and limited.  See Jackson v. Volvo Trucks North
America, Inc., 462 F.3d 1234, 1241 (10th Cir. 2006) (following
most other circuits which have expressly refused to carve out a
York exceptions to the ADDCA); Moorehead v. General Motors Corp.,
442 F. Supp. 873, 881 (E.D. Pa. 1977) ("Rea may be viewed as an
exceptional case . . . in which only the individual plaintiff was
in a position to assert the dealership's statutory rights.").

For example, in Bishay v. American Isuzu Motors, Inc., 404
F.3d 491 (1st Cir. 2005), the plaintiff argued he had standing
under ADDCA based on two theories: (1) when the dealership

corporation is for some reason unable or unwilling to bring suit against the manufacturer, or (2) when the franchise agreement expressly relies on the individual's participation and thereby makes that person "essential" to the dealership's operation. Bishay, 404 F.3d at 496 (citing Kavanaugh v. Ford Motor Co., 353 F.2d 710, 717 (7th Cir. 1965) for the first theory and York for the second). The First Circuit rejected these arguments. First, the court explained that in Kavanaugh, "it was 'inconceivable' that the dealership corporation would seek ADDCA relief; all of its voting stock was owned by the manufacturer, and thus the latter in essence would have been suing itself." Id. (citing Kavanaugh, 353 F.2d at 717). The court found that "nothing of the sort" was present in the case before it. Id. Second, the court explained that the York "exception rests on the notion that the corporation and the individual owner/operator can become so intertwined as to properly be considered a single entity, justifying disregard of the corporate form." Id. (citations omitted). The court noted that the majority of courts to address the issue have rejected this approach. Id. (citing Sherman v. British Leyland Motors, Ltd., 601 F.2d 429, 440 n.11 (9th Cir. 1979) ("we are not persuaded to follow York" ); Bronx Chrysler Plymouth, 212 F. Supp. 2d at 239-43 (deeming York inconsistent with Second Circuit's Vincel decision); Northgate Motors, Inc. v. General Motors Corp., 111 F. Supp. 2d 1071, 1075-

76 (E.D. Wis. 2000); Conroy Datsun Ltd. v. Nissan Motor Corp.,
506 F. Supp. 1051, 1055-56 (N.D. Ill. 1980); Moorehead v. General
Motors Corp., 442 F. Supp. 873, 880 (E.D. Pa. 1977); Westside-
Marrero Jeep Eagle, Inc. v. Chrysler Corp., 56 F. Supp. 2d 694,
699-701 (E.D. La. 1999) (finding York "likely misguided" but
still binding in circuit)).  The court further explained, "In
support of the majority view, it is noted *inter alia* that the
owner/operator, having chosen the corporate form, should
ordinarily be held to that decision.  Especially where the
corporation is able to pursue an ADDCA claim (either directly or
through a bankruptcy trustee), no equitable reason is seen for
disregarding that form and allowing individuals to bring private
actions for their personal benefit."  Id.  Thus, on the York
theory, the court followed the majority view and held that the
text of the statute plainly cut against the plaintiff, and "where
parties choose the corporate form and receive all the benefits
that flow from that structure, we should be hesitant to ignore
the consequences."  Id. at 1241.

Here, the individual plaintiffs' only arguments that the
York and Kavanaugh exceptions should apply are (1) that the
parties agreed that the ability of Vineland Mitsubishi to
satisfactorily perform was expressly conditioned upon the
involvement of the "Owners," which the individual plaintiffs are
specifically listed, and (2) that the Dealer Sales and Service

40

Agreement specifically provided that Morrett exercise the
functions of the "Executive Manager," and that MMNA entered into
the agreement "in reliance upon, and in consideration of, the
personal qualifications and representations of the above-named
Executive Managers."  (Pl.'s Opp. citing First Amended Compl.,
Ex. B.)  What the individual plaintiffs fail to point out,
however, is that MMNA entered into the dealership agreement with
Darrick Enterprises, Inc., which is named as the "dealer," and
not with the individual plaintiffs.  (First Amended Compl., Ex. B
at 1.)

The individual plaintiffs have not demonstrated that the
Kavanaugh/Rae and York exceptions are applicable here.  First,
the corporate entity is able to assert an ADDAC claim on its own
behalf, and indeed it has.  Second, even though the agreement was
entered into upon consideration of the qualifications and
participation of the "owners" and "executive managers," those
positions could be changed.  (First Amended Compl., Ex. B at 2.)
Although MMNA retained the right to ensure that the replacements
for the owners and executive managers were qualified, this clause
evidences that the individual plaintiffs themselves were not
essential to the dealership, but rather any qualified owner or
executive manager would suffice.  Cf. York, 447 F.2d at 790-91
(noting that the dealer agreement required the Yorks to "maintain
beneficial ownership and control of the stock in the dealership

41

corporation, could only be terminated if either of them died or failed to continue in the active management of the dealership or was convicted of certain crimes, and could even be terminated if Chrysler Motors thought that a disagreement between them might adversely affect the business"). Additionally, the individual plaintiffs chose to enter into the agreement under the protection of the corporate entity, and as it was stated in York, "individuals would not come within the scope of the Act merely because they were sole stockholders, officers and directors of the corporate franchise holder." Id. at 790. Consequently, the individual plaintiffs do not have standing to assert claims for harm to the corporation under the ADDCA.

This analysis, however, does not affect the more general proposition that a shareholder may maintain a claim if he seeks to recover for injuries that were inflicted on him individually rather than on the corporation. In re Kaplan, 143 F.3d 807, 812 (3d Cir. 1998). Standing to pursue an ADDCA claim for harms inflicted onto the corporate dealership is different than a shareholder's standing to assert claims under the ADDCA for harms done directly to him that are separate from those of the corporation.

Plaintiffs claim that MMNA[12] "failed to act in good faith in

_____

[12]Plaintiffs have also asserted these claims against MMCA and MMC-Japan. The claims against MMCA will be addressed below.

42

performing under the terms of Vineland Mitsubishi's agreements,"
and it "threatened, intimidated and coerced Vineland Mitsubsishi
to finance and sell vehicles that Vineland Mitsubishi had not
ordered and did not want . . . [and] also coerced Vineland
Mitsubishi into offering the 0-0-0 Program and to 'taking care
of' the problems caused by Defendants' irresponsible program."
(First Amended Compl. ¶¶ 240-41.)  Nothing in this claim
implicates harm to the individual plaintiffs separate from the
corporate entity.  Consequently, the individual plaintiffs'
claims under the ADDCA fail for this reason as well.

### 3.   Consumer Fraud Act claims

The individual plaintiffs have also asserted claims under
the New Jersey Consumer Fraud Act.  In order to determine whether
the individual plaintiffs have standing to assert this claim
separate from the corporation, it must first be determined
whether a CFA claim can be asserted at all.

Plaintiffs contend that the New Jersey Consumer Fraud Act is
applicable to every franchise agreement, including dealership
franchises, but the New Jersey courts have held that the NJCFA is
only applicable "when they are not covered by the Franchise
Practices Act and are offered to the general public."  <u>Kavky v.</u>

---

MMC-Japan has not moved to dismiss this claim against it.

Herbalife Int'l of Am., 820 A.2d 677, 680 (N.J. 2003).[13]  Neither
the individual plaintiffs nor MMNA appears to dispute that the
Franchise Practices Act applies to Plaintiffs' claims--Plaintiffs
assert a claim under the FPA,[14] and MMNA, rather than arguing
that it does not apply, argues that Plaintiffs have failed to
state a claim under it.[15]  The parties, however, do not address
whether a Mitsubishi dealership franchise is one that is "offered
to the public."  Consequently, MMNA's motion to dismiss this
claim will be continued pending supplemental briefing by the
parties on this issue.

4.    *The Corporation's Claims*

        MMNA has also moved to dismiss the plaintiff corporation's

_____

   [13]The Kavky court disagreed with a Third Circuit opinion that
concluded that the New Jersey Supreme Court would hold that the
NJCFA is inapplicable to any distributor or franchise
relationship, including those made available to the public at
large.  Kavky, 820 A.2d at 679 (discussing J & R Ice Cream Corp.
v. California Smoothie Licensing Corp., 31 F.3d 1259, 1270-74 (3d
Cir. 1994)).  The Kavky court stated, "Notwithstanding our high
regard for the Third Circuit, we are unable to agree with its
unduly restrictive interpretation of the Act."  Id.

   [14]It must be noted that plaintiffs are free to assert
alternative theories of recovery, and simply pleading an FPA
claim does not necessarily bar plaintiffs from also asserting a
CFA claim.  See Fed. R. Civ. P. 8(a) ("Relief in the alternative
or of several different types may be demanded.").

   [15]A franchise exists under the NJFPA if: (1) there is a
"community of interest" between the franchisor and the
franchisee; (2) the franchisor granted a "license" to the
franchisee; and (3) the parties contemplated that the franchisee
would maintain a "place of business" in New Jersey.  Cooper
Distributing Co., Inc. v. Amana Refrigeration, Inc., 63 F.3d 262,
268-69 (3d Cir. 1995) (citing N.J.S.A. §§ 56:10-3a, -4).

claims under the ADDCA, the FPA, and for breach of contract.

### a.   ADDCA

As stated above, under the ADDCA, an automobile dealer may bring suit against any automobile manufacturer for the failure of the automobile manufacturer to act in good faith in performing or complying with any of the terms or provisions of the franchise. 15 U.S.C. § 1222.   The Third Circuit has explained the purpose of the ADDCA:

> The ADDCA is a remedial statute enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices.  It is, essentially, a supplement to the national antitrust laws, passed to counter-balance the economic leverage a manufacturer has over its ostensibly independent dealers, and its "control over [its] product in what amounts to quasi-integration to the retail level of distribution."

Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92-93 (3d Cir. 2000) (internal citations omitted).  In order to maintain a cause of action under the ADDCA, (1) the plaintiff must be an automobile dealer; (2) the defendant must be an "automobile manufacturer" engaged in commerce; (3) there must be a manufacturer-dealer relationship embodied in a written franchise agreement; and (4) the plaintiff must have been injured by the defendant's failure to act in good faith.  Id. at 93.

With regard to what constitutes failure to act in good

45

faith, the Act defines the term "good faith" as "the duty of each party to any franchise . . . to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party . . . ."  15 U.S.C. § 1221(e). The Act, however, does not protect dealers against all unfair practices, but only against those breaches of good faith "evidenced by acts of coercion or intimidation"--the case law plainly requires actual, or threatened, coercion or intimidation as an element of an ADDCA claim.  <u>Northview Motors</u>, 227 F.3d at 93.

MMNA argues that Vineland's claim regarding the 0-0-0 Program does not allege that MMNA threatened, coerced or intimidated Vineland into that finance program, and alleges that MMCA, not MMNA, requested Vineland to take care of the problem, and as such, its claim must be dismissed.  This interpretation of Vineland's claim is curious, because Vineland claims exactly what MMNA claims it does not.  Vineland claims that MMC-Japan, MMNA, and MMCA "failed to act in good faith in performing under the terms of Vineland Mitsubishi's agreements," and MMC-Japan, MMNA, and MMCA "threatened, intimidated and coerced Vineland Mitsubsishi to finance and sell vehicles that Vineland Mitsubishi had not ordered and did not want . . . [and] Mitsubishi Motors, MMNA, and MMCA also coerced Vineland Mitsubishi into offering the

46

0-0-0 Program and to 'taking care of' the problems caused by
Defendants' irresponsible program." (First Amended Compl. ¶¶
240-41.) MMNA may ultimately prove that it did not threaten,
intimidate or coerce Vineland into doing anything, but Vineland
has adequately pleaded these elements, and, consequently, has
stated a viable claim under the ADDCA, withstanding MMNA's motion
to dismiss.

### b.   FPA and Breach of Contract Claim

MMNA has moved to dismiss Vineland's claim under the FPA, as
well as its breach of contract claim. Vineland has alleged that
MMNA violated the FPA by imposing "unreasonable facilities," and
by requiring them to accept cars which were not ordered. (First
Amended Compl. ¶ 179, citing N.J.S.A. 56:10-7.4.) Vineland also
claims that MMNA breached their Dealer Sales and Service
Agreement Standard Provisions ("DSSA-SP"), which provide that
"[MMNA] agrees to ship [MMNA] Products to Dealer only on Dealers
orders." (Id. ¶ 217.) Vineland claims that MMNA violated that
provision by dumping unordered cars on Vineland during 2003.
(Id. ¶ 218.) Additionally, Vineland claims that MMNA breached
the DSSA-SP's prohibition on misleading advertising when it
instituted the 0-0-0 financing program. (Id. ¶ 219-20.)

MMNA argues that Vineland cannot contend that its agreement
to construct a new facility is a basis for a claim under the FPA,
because even though it does not appear that this issue has arisen

47

in cases involving the FPA, in cases involving the ADDCA, it is well-established that a "manufacturer does not make a wrongful demand if it merely insists that the dealer comply with a reasonable obligation imposed by the franchise agreement." (MMNA's Br. at 18-19, Docket No. 28, citing General Motors Corp. v. New AC Chevrolet, Inc., 263 F.3d 296, 326 (3d Cir. 2001).) MMNA also argues that because Vineland was not even a "motor vehicle franchise" when MMNA and Vineland agreed to the facilities requirement as a condition to entering into the interim and dealer agreements, Vineland cannot now use the FPA to defeat the very promises it made to induce MMNA to appoint it as an authorized Mitsubishi dealer in 2001. (Id. at 19.)

With regard to the viability of Vineland's FPA and breach of contract claims that MMNA "dumped" unordered cars onto it, MMNA argues that Vineland has not alleged with sufficient specificity that MMNA delivered unordered cars because Vineland knew which cars it ordered and which it did not, and, thus, should be able to plead specifics. With regard to Vineland's breach of contract claim for the 0-0-0 Program, MMNA argues that there is no allegation of what advertising was misleading, and there are no allegations that MMNA's advertising inaccurately described the program. Additionally, because this claim is essentially a fraud claim "clothed in a claim for breach of contract," Vineland should be required to plead with more specificity pursuant to

48

Rules 9(b) and 11.

Vineland counters that the correlation between the ADDCA and the FPA is misplaced, considering that "'the [New Jersey] Franchise Act provides an even higher degree of protection for franchisees than that afforded dealers by ADDCA.'"  (Pl.'s Opp. Docket No. 35, at 20, quoting General Motors Corp., 263 F.3d at 326).)  Vineland further argues that the purpose of the FPA is to prohibit unfair terms and conditions that might be included in franchise agreements.  (Id. at 18, citing N.J.S.A. 56:10-7.2.)  Based on this reasoning, Vineland argues that its allegation that MMNA imposed an unreasonable facility upon it states a valid claim.

With regard to its car dumping claim, Vineland argues that it has sufficiently pleaded, in accordance with the Federal Rules, a claim under the FPA and for breach of contract, and that MMNA's argument that Vineland must plead the details of each and every unordered motor vehicle requires more evidence than might be necessary to survive a motion for summary judgment.  Vineland does not appear to contest MMNA's arguments regarding its breach of contract claim for the 0-0-0 Program, however.

Vineland's unreasonable facility claim must stand.  The FPA prohibits a motor vehicle franchisor from imposing "unreasonable facilities" onto a franchisee.  N.J.S.A. 56:10-7.4.  Vineland claims that it is a franchisee upon which MMNA, a motor vehicle

49

franchisor, imposed an unreasonable facilities requirement.  This
pleading complies with Federal Civil Procedure Rule 8(a)(2),
because it is "short and plain statement" that gives MMNA fair
notice of what Vineland's claim is and the grounds upon which it
rests.

Vineland's "dumping" claim also must stand.  Even though
Vineland has not detailed every car that was "dumped" by MMNA
onto Vineland, under the liberal federal pleading rules, it is
not necessary to plead evidence, and it is not necessary to plead
all the facts that serve as a basis for the claim.  Bogosian v.
Gulf Oil Corp., 562 F.2d 434, 446 (3d Cir. 1977).  By stating
that the FPA and the DSSA-SP prohibit MMNA from sending Vineland
unordered cars, and alleging that MMNA did send Vineland
unordered cars and Vineland was damaged by MMNA's conduct,
Vineland has stated a claim which provides MMNA fair notice of
what its claim is and the grounds upon which it rests.  If, after
discovery, it is revealed that Vineland cannot support these
claims, then MMNA may move for judgment in its favor, but in
weighing a motion to dismiss, it must be determined "'not whether
a plaintiff will ultimately prevail but whether the claimant is
entitled to offer evidence to support the claim.'"  Bell Atlantic
v. Twombly, 127 S. Ct. 1955, 1969 n.8 (2007).  Vineland is
entitled to offer evidence to support these claims.

Concerning Vineland's 0-0-0 financing program claim, even

50

though Vineland has not addressed MMNA's arguments for dismissal, a motion to dismiss cannot be granted solely because it has not been opposed.  <u>Stackhouse v. Mazurkiewicz</u>, 951 F.2d 29, 30 (3d Cir. 1991).  There may be some cases, however, "where the failure of a party to oppose a motion will indicate that the motion is in fact not opposed, particularly if the party is represented by an attorney."  <u>Id.</u>  Because Vineland has vigorously opposed every other argument by MMNA, the Court will consider MMNA's motion to dismiss Vineland's breach of contract claim regarding the 0-0-0 Program as unopposed, and will grant MMNA's motion as to this particular claim.

### 5. *Warranty Reimbursement*

MMNA argues that not only has Vineland failed to properly plead a claim for warranty reimbursement under the New Jersey Franchise Practices Act, it is barred by the doctrine of judicial estoppel from asserting such a claim.

First, with regard to whether Vineland has sufficiently pleaded a warranty reimbursement claim, MMNA argues that because Vineland has alleged that MMNA failed to pay it at "reasonable retail rates" for warranty parts, and not that MMNA failed to pay the "prevailing retail rates," which is the term used in the FPA, their claim must be dismissed.  MMNA's argument is untenable and simply quibbles over semantics.

The FPA provides,

> The motor vehicle franchisor shall reimburse each motor
> vehicle franchisee for such services as are rendered
> and for such parts as are supplied, in an amount equal
> to the prevailing retail price charged by such motor
> vehicle franchisee for such services and parts in
> circumstances where such services are rendered or such
> parts supplied other than pursuant to warranty;
> provided that such motor vehicle franchisee's
> prevailing retail price is not unreasonable when
> compared with that of the holders of motor vehicle
> franchises from the same motor vehicle franchisor for
> identical merchandise or services in the geographic
> area in which the motor vehicle franchisee is engaged
> in business.

N.J.S.A. 56:10-15(a).

Even though the FPA requires that the franchisor reimburse a franchisee "in an amount equal to the prevailing retail price charged by such motor vehicle franchisee," this provision also admonishes that the prevailing rate must not be "unreasonable." Thus, by virtue of a franchisee requesting a reimbursement for the "prevailing retail price," it is requesting reimbursement for a reasonable rate, which is precisely what Vineland is seeking. Thus, Vineland has properly pleaded its claim.

Next, MMNA's argument that Plaintiffs are judicially estopped from asserting their warranty reimbursement claim because of inconsistent positions taken in this litigation and Vineland's bankruptcy proceedings raises an issue separate from

52

judicial estoppel.[16]  In its supplemental briefing, Vineland
points out that its warranty reimbursement claim now belongs to
the estate of Vineland Mitsubishi because of its Chapter 7
status, and only the Trustee has the authority to act on behalf
of the estate.  The parties briefly addressed this issue at oral
argument, and they agreed that all of Vineland's claims, and not
only the warranty reimbursement claim, belong to the Trustee.
(Tr. at 107-08.)  The parties appeared to further agree that the
Trustee is the proper plaintiff for Vineland.[17]  (Tr. at 106-08.)
The docket does not reflect that this issue has been resolved,
however.

        The Court will leave this issue for the parties to resolve
with each other, or for the parties to affirmatively request the
Court's guidance in deciding the issue.  In the event that the
judicial estoppel analysis is somehow affected, the Court will
await the resolution of the issue before making a decision on

---

        [16]Judicial estoppel can be applied when a party asserts a
certain position in a legal proceeding and prevails, only to
assert a contrary position later on because of changed interests.
In re Armstrong World Industries, Inc., 432 F.3d 507, 517-18 (3d
Cir. 2005) (citing New Hampshire v. Maine, 532 U.S. 742, 749-51
(2001)).  Its purpose is to protect the judicial process by
preventing parties from "deliberately changing positions
according to the exigencies of the moment."  Id.

        [17]Oral argument also presented other issues concerning the
individual plaintiffs' Chapter 11 status, as well as possible
conflicts presented by plaintiffs' choice of counsel in their
bankruptcy proceedings.  The Court invites the parties to
elaborate on these issues if necessary.

whether the claim is barred by judicial estoppel.

**B.    MMCA'S MOTION TO DISMISS**

According to Plaintiffs, Vineland entered into a "Motor Vehicle Loan and Security Agreement" with MMCA at the time it obtained its Mitsubishi franchise.  (First Amended Compl. ¶ 79.) Pursuant to the Loan Agreement, MMCA would pay MMNA, on behalf of Vineland, for vehicles ordered and received by Vineland from MMNA.  (Id. ¶ 80.)  In 2001, however, "MMNA began a single-minded and short-sighted strategy of increasing sales figures for Mitsubishi motor vehicles in the United States at any cost," and "[i]n order to increase publicly reported sales figures and meet Wall Street projections, MMNA engaged in, and MMCA aided and abetted, the institutional practice of 'dumping' unordered vehicles on Mitsubishi dealers, including Vineland Mitsubishi." (Id. ¶¶ 81-82.)

As a result of this "dumping," Vineland and other dealerships were forced to pay for the unordered vehicles, which the dealerships did not want or need and which sat unsold on their lots for months, resulting in excess financing charges. (Id. ¶¶ 83-84.)  These excess financing charges increased the cost of the vehicles to the dealers, which eroded the dealer's profit upon resale of the vehicles.  (Id. ¶ 84.)  MMCA then imposed financing charges on Vineland for cars that had not yet been delivered.  (Id. ¶ 85.)  It also unilaterally extended

54

Vineland's line of credit "well above the credit line authorized
under its agreement with Vineland Mitsubishi to support vehicles
that were never ordered by Vineland Mitsubishi."  (Id. ¶ 92.)
Plaintiffs claim that the vehicle dumping, increased credit line,
and finance charges "had the direct effect of increasing the day
to day costs associated with running the dealership," and it
placed Vineland in "extreme financial jeopardy because it
generated excessive debt."  (Id. ¶ 93.)

    Plaintiffs also allege that MMNA and MMCA agreed to loosen
MMCA's credit policies so that any person, regardless of their
credit worthiness, would qualify for the 0-0-0 Program, which
consisted of no money down, no payments for one year, and no
interest charged on the loan for many months.  (Id. ¶ 99.)
Plaintiffs had no choice to participate in this program, and they
claim that the long-term effect of the 0-0-0 Program "was to
place severe financial strain on Mitsubishi dealers, including
Vineland Mitsubishi."  (Id. ¶ 100, 99.)

    Plaintiffs also claim MMCA and the other Mitsubishi
defendants knew that the customers who signed up for the 0-0-0
Program would not be able to make their payments after the
promotion ended, and the Mitsubishi defendants "placed the onus
of resolving this financial and customer relations crisis on
Mitsubishi dealers."  (Id. ¶ 109.)  Specifically, MMCA told
Vineland to "take care of the problem, understanding this

55

instruction to be a thinly veiled threat and not wanting to damage its relationship with its franchisor and its financing company."  (<u>Id.</u> ¶ 109.)  "[F]earful of the consequences of failing to heed MMCA's threat, Vineland Mitsubishi was forced to accept vehicles purchased under the 0-0-0 Program as trade-ins on terms unfavorable to Vineland Mitsubishi in order to get consumers out of the 0-0-0 Program loans they could not afford." (<u>Id.</u> ¶ 110.)

Based on these allegations, all Plaintiffs have asserted claims against Mitsubishi Motors Credit of America ("MMCA") for violations of state and federal RICO (Counts II, VI, VII), violations of the Automobile Dealers' Day in Court Act (Count XI), and for declaratory relief (Count XIII).  Vineland has asserted claims against MMCA for breach of the loan agreement (Count IX) and breach of the implied covenant of good faith and fair dealing (Count X).  MMCA has moved to dismiss Plaintiffs' RICO claims, their ADDCA claims, and Vineland's breach of implied covenant claim.

**1.   *RICO claims***

Plaintiffs allege that MMCA conspired with MMNA to violate RICO.  It is appropriate to hold a defendant liable for conspiracy to violate RICO under § 1962(d) even if it cannot be held directly liable under § 1962(a), (b) or (c).  <u>Emcore Corp. v. PricewaterhouseCoopers, LLP</u>, 102 F. Supp. 2d 237, 264 (D.N.J.

2000) (citing <u>U.S. v. Antar</u>, 53 F.3d 568, 580 (3rd Cir. 1995)).
Conspiracy liability under § 1962(d) is governed by the "general
principles of criminal conspiracy law" which require only that
the defendant "share a common purpose" with his co-conspirators
and "knowingly agrees to facilitate a scheme, which includes the
operation or management of a RICO enterprise." <u>Smith v. Berg</u>,
247 F.3d 532, 538 (3d Cir. 2001).

Liability under § 1962(d) is met by "1) knowledge of the
corrupt enterprise's activities and 2) agreement to facilitate
those activities." <u>Id.</u> at 535.  A conspiracy claim must contain
supportive factual allegations sufficient to "describe the
general composition of the conspiracy, some or all of its broad
objectives, and the defendant's general role in that conspiracy."
<u>Rose v. Bartle</u>, 871 F.2d 331, 366 (3d Cir. 1989) (citations
omitted).  Allegations of conspiracy, however, are not measured
under the Rule 9(b) standard, which requires greater
particularity of allegation of fraud, but are measured under the
more liberal Rule 8(a) pleading standard.  <u>Id.</u> (citations
omitted).

Here, the crux of Plaintiffs' RICO claims against MMCA is
that, in concert with MMNA and MMC-Japan to expand their business
within the United States by fraudulently misrepresenting the
health of the brand to entice the formation of Plaintiffs'
dealership and other dealerships, as well as by misrepresenting

the volume of sales by dumping unordered cars onto these dealerships, MMCA implemented a financing program to facilitate this scheme.  This financing program included the unilateral increase of Plaintiffs' and other dealerships' credit limits, which placed an extreme financial burden on Plaintiffs and other dealerships, resulting in the failure of the dealerships.  These allegations sufficiently state a claim for RICO conspiracy because Plaintiffs have alleged MMCA's knowledge of the corrupt activities and its agreement to facilitate those activities.

In MMCA's opposition, MMCA focuses on Plaintiffs' failure to demonstrate specifically that cars were actually "dumped" on Vineland.  At oral argument, the Court expressed concerns over this issues as well.  Plaintiffs have explained that specific records have been difficult to obtain at this point in the case because Vineland's computer system is unavailable and because discovery has not begun.  Plaintiffs also explain, however, that they have Morrett's testimony about the unordered cars, as well as testimony from at least one other dealership concerning the same issue.  (Tr. at 27-28.)  Moreover, Plaintiffs are not only alleging that MMCA itself committed predicate acts, but rather it conspired with MMNA, which allegedly committed the predicate acts, to facilitate this fraud.[18]  These factors, in combination

---

[18]In addition to the claims set forth above in the RICO analysis with regard to MMNA, Plaintiffs claim that MMCA taught dealers how to manipulate the "Daybreak" credit application

with the regular Rule 8(a) pleading requirement applied to
Plaintiffs' pleadings with regard to conspiracy allegations, all
weigh in favor of allowing Plaintiffs to explore their RICO
claims through discovery.  Indeed, "[u]nder the modern federal
rules, it is enough that a complaint put the defendant on notice
of the claims against him.  It is the function of discovery to
fill in the details, and of trial to establish fully each element
of the cause of action."  Seville Indus. Machinery Corp. v.
Southmost Machinery Corp., 742 F.2d 786, 789-90 (3d Cir. 1984)
(citing 5 C. Wright & A. Miller, Federal Practice and Procedure §
1215 (1969) and discussing the pleading standard for RICO
claims).  Consequently, Vineland may proceed with their RICO
claims against MMCA, and in the limited sense as explained above
in the analysis of their RICO claims against MMNA, the individual
plaintiffs' claims may proceed as well.

     2.  *ADDCA claims*

     As a primary matter, MMCA has joined in MMNA's motion to
dismiss the individual plaintiffs' ADDCA claim, and for the same
reasons their ADDCA claim fails against MMNA, it also fails
against MMCA.  Thus, it must only be decided whether Vineland can

---

system, which was operated by computers throughout the country
using interstate lines, to secure credit card for unqualified
applicants.  (RICO Case Information Statement at 13.)  It is
unclear whether Plaintiffs assert this claim as MMCA perpetrating
a predicate act, or just evidence of MMCA's knowing participation
in the conspiracy.

maintain its ADDCA claim against MMCA.

MMCA argues that Vineland's ADDCA claim against them fails because a claim under the ADDCA must be asserted against a "manufacturer" with which a dealer has a franchise agreement, and Vineland has only alleged that MMCA is the "finance arm" of Mitsubishi Motors, and as such, it is not a manufacturer. Further, MMCA argues that even if the ADDCA applied, Vineland has not alleged "actual or threatened coercion or intimidation" required by the ADDCA.  Vineland counters that courts have routinely found that financing arms can be liable under the ADDCA, even where the financing arms are not parties to the underlying franchise agreement.  Vineland also argues that it has has adequately pleaded MMCA's lack of good faith.

The ADDCA authorizes federal court actions by automobile dealers against "automobile manufacturers."  15 U.S.C. § 1222. The ADDCA defines "automobile manufacturer" as "any person, partnership, corporation, association, or other form of business enterprise engaged in the manufacturing or assembling of [automobiles], including any person, partnership, or corporation which acts for and is under the control of such manufacturer. . . ."  Id. § 1221(a).  The Third Circuit has not analyzed whether a manufacturer's credit financing company is an "automotible manufacturer" as contemplated by the ADDCA, but Plaintiffs have cited decisions of several other federal courts that have

60

examined the issue and have held that as long as a financing company is acting as an agent of the manufacturer in facilitating the manufacturer's automotive business, its actions are cognizable under the ADDCA, even if the financing company was not actually a party to the franchising agreement.  See Turnpike Ford, Inc. v. Ford Motor Co., 415 F. Supp. 2d 666, 669 (S.D.W. Va. 2006) (citing Colonial Ford, Inc. v. Ford Motor Co., 592 F.2d 1126, 1128 (10th Cir. 1979); Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp., 83 F. Supp. 2d 384, 387 (S.D.N.Y. 2000); Stamps v. Ford Motor Co., 650 F. Supp. 390, 396 (N.D. Ga. 1986); DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 550 F. Supp. 1199, 1201-02 (N.D. Ill. 1982); DeCantis v. Mid-Atlantic Toyota Distribs., Inc., 371 F.Supp. 1238, 1241 (E.D. Va. 1974)).

The court in Turnpike Ford explained that the "key question is whether the financing company acted to facilitate the sale of the manufacturer's automotive sales; if so, the financing company is susceptible to suit."  Id. (citing Stamps, 650 F. Supp. at 396).  "As a general rule, courts have been reluctant to dismiss ADDCA claims without reaching their merits," because "[d]eciding whether a financing company acted on behalf of an automobile manufacturer is a question of fact."  Id. (citations omitted).

Here, the key question is whether Vineland has adequately pleaded that MMCA "acts for and is under the control of" MMNA and/or MMC-Japan, which are automobile manufacturers.  Corollary

61

to that question is whether Vineland has adequately pleaded "actual or threatened coercion or intimidation" required by the ADDCA.  If it has, then its claim survives MMCA's motion to dismiss.

Vineland has alleged that "MMNA and MMCA act for and are under the control of Mitsubishi Motors," and "MMNA and MMCA are wholly-owned subsidiaries of Mitsubishi Motors."  (First Amended Compl. ¶ 239.)  Vineland further claims that MMCA, with MMNA and Mitsubishi Motors, "failed to act in good faith in performing under the terms of Vineland Mitsubishi's agreements," and it "threatened, intimidated and coerced Vineland Mitsubsishi to finance and sell vehicles that Vineland Mitsubishi had not ordered and did not want . . . [and] also coerced Vineland Mitsubishi into offering the 0-0-0 Program and to 'taking care of' the problems caused by Defendants' irresponsible program."  (First Amended Compl. ¶¶ 240-41.)  These allegations sufficiently state an ADDCA cause of action by Vineland against MMCA.

### 3.    *Breach of implied covenant of good faith and fair dealing claim*

Vineland alleges that MMCA breached the implied covenant of good faith and fair dealing in their Loan and Security Agreement by "its unauthorized and unwanted extension of Vineland Mitsubishi's maximum line of credit in excess of $2.3 million and by its unauthorized payment for and financing of Mitsubishi motor vehicles dumped without a bona fide purchase order or

arrangements for delivery by Vineland Mitsubishi." (First Amended Compl. ¶ 79.) Vineland also alleges that the credit and financing of the dumped vehicles was effected "in conjunction with MMNA's scheme to inflate sales numbers and transfer risk of loss to Vineland." (Id. ¶ 234.) As a result, Vineland claims that it was damaged by MMCA's beach of implied covenant of good faith and fair dealing. (Id. ¶ 235.)

MMCA has moved to dismiss this claim, arguing that because the written express terms of the Loan Agreement govern the parties' obligations, and because Vineland has asserted a breach of contract claim based on the same conduct, Vineland is prohibited from maintaining both claims. Vineland counters that it can maintain a beach of contract claim and a breach of the implied covenant of good faith and fair dealing claim simultaneously because even though the implied covenant cannot override a contract's express terms, a party's performance under a contract may breach the implied covenant even if it does not violate an express term.

As an initial matter, MMCA and Vineland rely upon New Jersey law to support their arguments, but MMCA points out earlier in its brief in its discussion of Vineland's RICO claims that the choice of law provision in the Loan Agreement selects California law as controlling. (MMCA's Br. at 12, Docket No. 50.) Neither party addresses this choice of law issue in the context of

Vineland's breach of contract and breach of implied covenant claims, however.  Consequently, without the parties specifically addressing how the choice of law provision in the Loan Agreement affects the analysis of the viability of Vineland's claim for breach of the implied covenant of good faith and fair dealing, MMCA's motion to dismiss this claim shall be continued pending further briefing on this issue.

### C.   MMC-JAPAN'S MOTION TO DISMISS

All Plaintiffs have asserted claims against MMC-Japan for violations of state and federal RICO (Counts II, VI, VII), fraudulent concealment and fraudulent misrepresentation (Count III), violation of the New Jersey Consumer Fraud Act (Count IV), violations of the Automobile Dealers' Day in Court Act (Count XI), and alter-ego liability for the conduct of MMNA and Mitsubishi Credit (Count XII).  Mitsubishi Motors has filed a motion to dismiss Plaintiffs' claims for lack of personal jurisdiction.  It has also moved to dismiss Plaintiffs' alter-ego liability claim, arguing that it cannot stand as an independent claim.

### 1.   *Whether Plaintiffs have asserted a viable RICO claim against MMC-Japan, and whether this Court may exercise personal jurisdiction over MMC-Japan*

Plaintiffs' RICO Case Information Statement explains how they claim that MMC-Japan conspired with MMNA and MMCA to defraud them and other dealerships.  Plaintiffs allege that MMC-Japan

64

engaged in a pattern and practice of hiding consumer complaints for twenty years, which MMC-Japan admitted in 2000, and because of which MMC-Japan executives were arrested and sales plummeted world-wide, including the United States.[19]   (RICO Case Statement at 3.)   Plaintiffs allege MMC-Japan specifically targeted the United States market with the help of MMNA and MMCA, over which entities MMC-Japan had effective control, and conspired to conceal the health of the brand in Japan and in the United States, as well as conspired to defraud Mitsubishi franchisees. (Id. at 2-3.)   Plaintiffs claim that if they had known about the severity of the problems in Japan, and if they were not provided misleading and fraudulent market analyses, they would have never agreed to become a Mitsubishi dealer in 2001 by entering into an interim agreement, and then build a new facility and enter into a more permanent dealer agreement.

        MMC-Japan has moved to dismiss these claims by arguing that

_____

        [19]MMC-Japan takes issue with Plaintiffs' reference to what they term "secret recalls," stressing that these recalls did not occur in the United States. (MMC-Japan's Renewed Mot. at 8 n.6, Docket No. 47.)   With regard to the secret recalls, Plaintiffs do not maintain that they occurred in the United States, but rather that if they had known about their occurrence in Japan, it was a factor they would have considered in whether to establish a Mitsubishi franchise.
        MMC-Japan also argues that Plaintiffs could not have any damages resulting from the arrests of Japanese executives in May 2004 because Plaintiffs had already filed bankruptcy by then. (Id. at 4 n.2.)   This fact may limit Plaintiffs' damages if they are successful on their claims, but their allegations concerning MMC-Japan's conduct precede their bankruptcy filing, and thus does not serve to bar their claim as a matter of law.

Plaintiffs have failed to state a viable RICO claim against it,
and, consequently, there is no basis for this Court's exercise of
personal jurisdiction over it.[20]  First, with regard to the
viability of Plaintiffs' RICO claims, as stated above in the
analysis of Plaintiffs' RICO claims against MMCA, liability under
§ 1962(d) is met by knowledge of the corrupt enterprise's
activities and agreement to facilitate those activities.
Plaintiffs have alleged these elements.

Second, with regard to personal jurisdiction, Plaintiffs
argue that when a plaintiff's claim rests on a federal statute
authorizing nationwide service of process, which RICO does, a
federal court's personal jurisdiction may be assessed on the
basis of the defendant's national contacts.  (Pl.'s Opp. at 4,
Docket No. 53.)  Plaintiffs also point out that MMC-Japan
concedes that if they have stated a viable RICO claim against it,
the nationwide contacts analysis would apply.[21]  (Id., citing

_____

[20]MMC-Japan also argues that Plaintiffs' claim of "effective
control" is not enough to pierce the corporate veil to establish
liability on the part of the corporate parent.  (MMC-Japan's
Renewed Mot. at 5 n.3, Docket No. 47.)  Even though this may be
significant with regard to Plaintiffs' "alter-ego" claim, it is
immaterial to the RICO analysis because Plaintiffs have asserted
MMC-Japan's independent liability based on its conspiracy with
two other entities.

[21]It must be noted that there is a circuit split regarding
which RICO provision authorizes nationwide service of process,
and the standards for determining when nationwide service is
authorized.  The Third Circuit has not addressed the issue.
See Freedom Medical Inc. v. Gillespie, 2007 WL 2480056, at *24
n.12 (E.D. Pa. Aug. 29, 2007) (explaining that the Second,

MMC-Japan's Renewed Opp. at 2-3 & n. 1.)  Whether the nationwide

contacts analysis applies is not that clear, however.  The

parties have not indicated that MMC-Japan was served via the

service provision in RICO or whether it was served pursuant to

New Jersey's long arm statute or Federal Civil Procedure Rules.

This distinction is important because RICO does not provide for

worldwide service, and, thus, if MMC-Japan was served pursuant to

a method other than RICO, a nationwide contacts analysis would

not automatically apply.  Koken v. Pension Benefit Guar. Corp.,

430 F. Supp. 2d 493, 498 (E.D. Pa. 2006) (citing Doe v. Unocal

Corp., 27 F. Supp. 2d 1174, 1183 (C.D. Cal. 1998), which held

that the national contacts analysis did not apply because the

foreign defendant was not served pursuant to the provision in

RICO since RICO did not provide for worldwide service, and that

"it would be inappropriate for a federal court to effectively

extend the territorial reach of a federal statute by applying a

national contacts test for personal jurisdiction where service is

---

Seventh, Ninth and Tenth Circuits have held it authorized by §
1965(b), which authorizes nationwide service when "the ends of
justice require that other parties residing in any other district
be brought before the court," and that the Fourth and Eleventh
Circuits have held it authorized by § 1965(d) which allows "[a]ll
other process" in a RICO action to be served in "any judicial
district in which such person resides, is found, has an agent or
transacts his affairs").  "The practical distinction between
these two interpretations appears to be whether nationwide
service of process is authorized in all instances or only when
'the ends of justice require.'" Id.  The Court does not need to
make that distinction, however, because the Court is not applying
a RICO national contacts analysis.

not effected pursuant to that federal statute").

In this circumstance, there are two methods by which to determine whether personal jurisdiction exists over MMC-Japan. First is the traditional Fourteenth Amendment jurisdictional analysis under New Jersey's long arm statute.  Smith v. S&S Dundalk Engineering Works, Ltd., 139 F. Supp. 2d 610,  617 (D.N.J. 2001) (citations omitted) ("In a diversity case or a case that arises under a federal law which does not provide for service of process on a party outside the state, the issue of personal jurisdiction must be determined according to the law of the forum state."); see also N.J. Civ. Pract. R. 4:4-4; Carteret Savings Bank, FA v. Shushan, 954 F.2d 141, 145 (3d Cir. 1992).

Jurisdiction under the state's long arm statute is measured by the defendant's specific contacts with the state.  A court can exercise jurisdiction over an out-of-state defendant only if it purposefully avails itself of privilege of conducting activities within the forum State.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985).  To prove that a defendant has purposefully availed itself of that state, a plaintiff may rely upon a defendant's specific contacts with the forum state, and specific jurisdiction is invoked when a claim is related to or arises of out the defendant's contacts with the forum.  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984). In assessing the sufficiency of minimum contacts for personal

68

jurisdiction, the court must focus on the "relationship among the defendant, the forum and the litigation." Keeton v. Hustler, 465 U.S. 770 (1984).

If a defendant does not have specific contacts with the state, a court may exercise general jurisdiction if the defendant has maintained "continuous and systematic contacts" with the forum state. Helicopteros, 466 U.S. at 416. To establish general jurisdiction the plaintiff must show significantly more than mere minimum contacts with the forum state. Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987).

Once minimum contacts have been established, a court may inquire whether "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" Burger King Corporation, 471 U.S. at 476 (citations omitted). For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable to require the defendant to defend the suit in the forum state. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980).

The second method for determining the existence of personal jurisdiction is pursuant to Federal Civil Procedure Rule 4(k)(2), which provides, "If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with

respect to claims arising under federal law, to establish
personal jurisdiction over the person of any defendant who is not
subject to the jurisdiction of the courts of general jurisdiction
of any state." Fed. R. Civ. P. 4(k)(2). This Rule was enacted
to fill a specific gap in the federal law presented when a
foreign defendant may have significant aggregate contacts with
the United States, but insufficient contacts with any single
state to support jurisdiction under state long-arm statutes. Id.
(Advisory Committee Notes); BP Chemicals Ltd. v. Formosa Chemical
& Fibre Corp., 229 F.3d 254, 258 (3d Cir. 2000). Thus, in a case
arising under federal law, and where a foreign defendant lacks
specific contacts with any state, Rule 4(k)(2) directs a court to
"scrutinize plaintiff's allegations to ascertain whether
plaintiff has demonstrated that defendant has sufficient
aggregate contacts with the United States to comport with
constitutional notions of due process." Smith, 139 F. Supp. 2d
at 621-22 (citations omitted).

Under either method, a plaintiff bears the burden to produce
actual evidence, through sworn affidavits or other competent
evidence, and not through bare pleadings alone, of the
defendant's contacts with the forum. Id. (citing Time Share
Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 and n.9
(3d Cir. 1984)). When the court does not hold an evidentiary
hearing on a motion to dismiss for lack of personal jurisdiction,

70

however, "the plaintiff need only establish a *prima facie* case of personal jurisdiction," <u>Miller Yacht Sales, Inc. v. Smith</u>, 384 F.3d 93, 97 (3d Cir. 2004), and the court must accept the plaintiff's evidence as true and resolve all disputed facts and draw all reasonable inferences in its favor. <u>Id.</u>

Here, Plaintiffs contend that they have provided enough evidence to support all bases of personal jurisdiction over MMC-Japan. The primary evidence Plaintiffs rely upon is MMC-Japan's annual reports. In those reports, Plaintiffs contend that MMC-Japan specifically targeted the United States and New Jersey for the sale of its motor vehicles. (Pl.'s Opp. at 6-7, Docket No. 53.) Such statements include:

> MMC expressly identifies the United States as a "vital core market" for the sale of MMC motor vehicles that is "[i]mportant" and "strategically key" for MMC.
> MMC designs motor vehicles exclusively for sale in the United States.
> The sale of MMC's motor vehicles has reached as high as 360,000 units in a year accounting for over $10 billion in sales to United States consumers.

(<u>Id.</u> at 6.)

Plaintiffs also contend that those reports, as well as other communications with the public, show that MMC-Japan exercised, and continues to exercise, substantial control over MMNA and MMCA, including:

In 2000, MMC established a "supervisory unit" to

71

supervise and coordinate the activities of MMC's North
American subsidiaries.

In its 2004 Annual Report, MMC has accepted
"unequivocal responsibility" for its overseas
operations including MMNA and MMCA, which included
making "a raft of changes to [MMC's overseas]
management systems."

MMC stated that "Company headquarters has shifted to a
structure that allows control of each facet of overseas
operations."

MMC has implemented unified production and quality
control procedures for all plants, including those in
the United States.

MMC's Japan office gives "direct approval for credit
strategy and sales policies" in North America.

MMC stated that it "dispatched numerous management
personnel from Japan," including MMC's former Managing
Director in charge of overseas operations, to put in
place a new organizational structure in North America
that would be "responsive and strongly linked to the
head office in all fields, including production,
development, sales and marketing."

(Id. at 7-8.)

Furthermore, in addition to MMC-Japan's statements in its
annual reports, the annual reports from 2003 and 2005 reveal that
MMC-Japan has entered into two joint ventures in the United
States that have led to the manufacture of over one million
engines a year and the finance of billions of dollars in sales
for MMC-Japan motor vehicles.  (Id. at 8.)

Based on this evidence, Plaintiffs argue that MMC-Japan has
purposefully availed itself to New Jersey and the rest of the
United States, and these contacts are related to the instant
litigation involving a conspiracy to defraud Mitsubishi dealers

72

in New Jersey and the United States.  Further, Plaintiffs argue
that this evidence evidences a continuous and systematic
targeting of its activities towards New Jersey and the United
States, and it has benefitted tremendously from these contacts.
As a result, Plaintiffs contend that this Court may exercise
personal jurisdiction over MMC-Japan.

MMC-Japan contests all of Plaintiffs' arguments,
specifically arguing that Plaintiffs' use of the annual reports
is flawed and taken out of context, and that the annual reports
are not sufficient to establish MMC-Japan's control over its
subsidiaries to pierce the corporate veil.  MMC-Japan also bases
its arguments for why this Court cannot exercise personal
jurisdiction over it on the premise that Plaintiffs have failed
to state a viable RICO claim against it.

The Court agrees with Plaintiffs.  As an initial matter,
Plaintiffs have cited sufficient persuasive authority
establishing the propriety of using a company's annual reports as
evidence for personal jurisdiction.  (See Pl.'s Opp. at 5, citing
ten cases.)  With regard to whether this Court has personal
jurisdiction over MMC-Japan, the key factor is that Plaintiffs
have stated a viable RICO claim against MMC-Japan based on
Plaintiffs' allegations that MMC-Japan conspired with its
subsidiaries, MMNA and MMCA, to defraud the Plaintiffs in New
Jersey, as well as other franchisees throughout the United

73

States.  This factor alone could establish personal jurisdiction over MMC-Japan.  <u>See</u> <u>IMO Indus., Inc. v. Kiekert AG</u>, 155 F.3d 254, 257 (3d Cir. 1998) (discussing the "effects test" set forth in the Supreme Court case <u>Calder v. Jones</u>, 465 U.S. 783 (1984), and stating "an intentional tort directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied.").

In addition, however, Plaintiffs have set forth evidence demonstrating that MMC-Japan, while not specifically communicating with Plaintiffs, specifically targeted the United States market and directed its subsidiaries and co-conspirators on how to conduct business within the United States.[22] Considering Plaintiffs' valid RICO claim against MMC-Japan, as well as the evidence of its purposeful availment to the United States, the exercise of personal jurisdiction over MMC-Japan comports with fair play and substantial justice.[23]

_____

[22]The Court takes no position as a matter of law on the substantive allegations concerning MMC-Japan's "control" over MMNA and MMCA.  Rather, this finding that MMC-Japan directed the affairs of MMNA and MMCA is limited to the personal jurisdiction analysis, which uses a different burden of proof than the one applied to determining any legal claim with regard to MMC-Japan's relationship with its subsidiaries.

[23]The Court finds that personal jurisdiction exists under both the principles of general jurisdiction or national aggregate contacts pursuant to Rule 4(k)(2).

### 2.   *Whether Plaintiffs' Alter-Ego claim is viable*

MMC-Japan has moved to dismiss Plaintiffs' alter-ego claim, arguing that it is not an independent cause of action.  MMC-Japan relies on <u>Trustees of Nat. Elevator Industry Pension, Health Benefit and Educational Funds v. Lutyk</u>, 332 F.3d 188, 192 (3d Cir. 2003), which quotes <u>Peacock v. Thomas</u>, 516 U.S. 349, 354 (1996), which states, "Piercing the corporate veil is not itself an independent ERISA cause of action, but rather is a means of imposing liability on an underlying cause of action."

MMC-Japan's reliance on this quote to support its position is flawed.  First, the statement was made in the context of an ERISA claim.  Second, it actually states the opposite of MMC-Japan's contention because it says that piercing the corporate veil is a means of imposing liability--which is essentially the same as saying that it is an independent cause of action.  Third, even though Plaintiffs have not expressly stated that their claim arises under New Jersey state law, piercing the corporate veil is a claim in New Jersey.  See <u>Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.</u>, 296 F.3d 164, 171 (3d Cir. 2002) (stating that piercing the corporate veil is a "tool of equity," and "[i]n order to state a claim for piercing the corporate veil under New Jersey law, a plaintiff must show that: (1) one corporation is organized and operated as to make it a

75

mere instrumentality of another corporation, and (2) the dominant corporation is using the subservient corporation to perpetrate fraud, to accomplish injustice, or to circumvent the law." (citations omitted)).  Consequently, Plaintiffs' alter-ego claim may stand.[24]

## III. CONCLUSION

In summary, the following claims survive MMNA's motion to dismiss: Vineland's and the individual plaintiffs' claims for common law fraud and for violations of RICO; the Hesses' FPA claim with regard to unreasonable facilities; Vineland's FPA claim with regard to unreasonable facilities and "dumping"; and Vineland's ADDCA claim.  The following claims do not survive MMNA's motion to dismiss: the Hesses' FPA claim with regard to "dumping" and Morrett's FPA claim with regard to "dumping" and unreasonable facilities; Vineland's FPA claim with regard to the 0-0-0 Program; and the individual plaintiffs' ADDCA claim.

With regard to MMCA's motion to dismiss, Vineland's and the individual plaintiffs' claims for violations of RICO and Vineland's ADDCA claim survive.  The individual plaintiffs' claims under the ADDCA do not survive MMCA's motion.  With regard

---

[24]MMC-Japan has not moved to dismiss the other claims of Plaintiffs: fraudulent concealment and fraudulent misrepresentation (Count III), violation of the New Jersey Consumer Fraud Act (Count IV), violations of the Automobile Dealers' Day in Court Act (Count XI).

to MMC-Japan's motion to dismiss, Vineland's and the individual
plaintiffs' RICO and alter-ego claims survive.

The motions relating to the individual plaintiffs' CFA claim
against MMNA, Vineland's warranty reimbursement claim under the
CFA against MMNA, and Vineland's breach of the implied covenant
of good faith and fair dealing against MMCA are continued for
further briefing by the parties.

An appropriate Order will issue.


Dated: September 28, 2007                s/ Noel L. Hillman

At Camden, New Jersey                    NOEL L. HILLMAN, U.S.D.J.